# THE JOSEPH JOSEPH AND BROS. COMPANY *vs.* THE SCHONTHAL IRON AND STEEL COMPANY.

*·Letters Held Not to Constitute a .Complele Contract—Action For Breach of Agreement to Buy Goods—Delivery of Different Article a Failure to Perform And Not a Breach of Warranty—Controversy as to Whether Contract Was in Writing or by Parol—Evidence as to Other Negotiations—Harmless Error—Comment by Trial Judge in Presence of Jury—Exceptions.*

Plaintiff's sales memorandum sent to defendant stated that he had sold to the defendant 1,000 tons scrap steel rails of certain dimensions terms cash vs. bill of lading.   Defendant's letter of reply was not an unqualified acceptance, but added the condition that the rails were to be of the P. R. R. pattern and were to come off of the Central Railroad of N. J. Plaintiffs answer to this rejected the proposed condition and stated that the rails would come from the Southern Railway.   Defendant then wrote that it was immaterial where the rails came from, "but it was understood that they are rails taken up from the tracks and not rails picked up from sidings," also that "regarding drafts we will take this up as fast as the cars appear in sight."   Plaintiff did not accede to the terms of this letter by an answer.   *Held,* that these letters do not show a complete agreement of the parties as to all the terms so as to constitute a final contract, but they consist of propositions and counter propositions which did not end in a definite conclusion; there being no distinct agreement as to the time of payment and no assent by the plaintiff to defendant's condition that the rails should not be picked up from sidings.

In an action to recover damages for a breach of an alleged contract by defendant to buy 1,000 tons of rails, where the defendant had received 678 tons and paid for most of it and had rejected 330 tons because not in compliance with the specifications, the defendant pleaded set off, and offered evidence tending to show that some of the rails and other scrap contained in the lots paid for by him were defective, being short pieces switch frogs and so forth, and also evidence to show the quantity and value of that inferior material.   *Held,* that this evidence, if found by the jury to be true, was legally sufficient to support the plea of set off.

When a plaintiff, in an action for a breach of contract, contends that it was wholly contained in certain writings, the trial Court is under no obligation of its own motion without any request from the plaintiff, to instruct the jury that they should determine whether the contract was partly in writing and partly oral.

Md.]                    Statement of the Case.

Defendant's evidence was that his agreement was to buy 1,000 tons of re-rolling steel rails, that is, material suitable for re-rolling into lighter rails.   *Held,* that if a part of the material shipped to the defendant and rejected by him was not fit for re-rolling rails, then there was no breach of a warranty by the plaintiff that the rails were fit for re-rolling, but the plaintiff had failed to perform his contract to deliver the kind of article contracted for, and he has no right to complain that the defendant declined to accept what he had not agreed to buy.

If the sale is of a described article, the tender of an article answering the description is a condition precedent to the purchaser's liability.

When the seller in an action for breach of a contract alleges that the agreement was to deliver steel scrap rails of certain dimensions, and the buyer alleges that the contract was for the sale of old rails suitable or fit for re-rolling into lighter sections, evidence is admissible to show that in coneersation and in letters between the parties relating to other sales, as well as to the one in conti oversy, the buyer had stated to the seller that his business was that of re-rolling rails and that he used nothing but long length rails for that purpose.   The jury might find from such evidence that the contract actually made was the one alleged by the buyer and not the one upon which the seller relied.

In an action to recover damages for breach of a contract to buy goods which were shipped to, but rejected by, the buyer, evidence was admitted to show that the rejected articles were secretly sent away at night by the agent of the seller.   *Held,* that although this evidence does not tend to prove any issue in the case, yet, its admission did not cause any injury to the seller (the appellant), and is consequently no ground for reversing the judgment.

If the trial Judge sees fit to give his reasons for his rulings on the prayers in the presence of the jury. and in so doing makes statements prejudidicial to a party, an exception may be taken, but the specific statement objected to must be distinctly indicated in the bill of exceptions.   An exception "to the opinion expressed by the Court on the prayers in the presence of the jury," without setting forth that opinion, is entirely too. indefinite.

When a party's testimony has been taken under a commission and he is afterwards a witness at the trial, he may be asked on cross-examination if he had not procured his stenographer to give testimony under the commission in order to corroborate his own evidence.

Appeal from the Circuit Court for Allegany County (KEEDY, J.)

*Plaintiff's 1st Prayer.*—If the jury believe from the evidence that the plaintiff on October 4th, 1901, sent to the defendant the sales memorandum bearing that date, which has been

offered and read in evidence, and that the defendant in reply thereto sent to the plaintiff the letter bearing date of October 5th, 1901, which has been offered and read in evidence, and that the plaintiff in reply thereto wrote and sent to the defendant the letter dated October 7th, 1901, which has been offered and read in evidence and that the defendant in reply thereto wrote and sent to the plaintiff the letter dated October 10th, 1901, which has been offered and read in evidence, then the jury are instructed that thereby a contract was made and entered into between the plaintiff, agreed to sell and deliver to defendant, free on board cars at defendant's mill at Cumberland, Maryland, and the defendant agreed to buy from the plaintiff about one thousand tons of 2240 pounds of scrap steel rails, 200 tons whereof were to be of the weight of 56 pounds per yard or more, and of the length of three feet or more, and eight hundred tons were to be of the weight of sixty pounds to the yard or more and of the length of five feet or more, at the price of $20.50 per ton of 2240 pounds, payable in cash on the delivery to the defendant of bills of lading or orders for the rails.

And if the jury further believes from the evidence that the plaintiff shipped under said contract, to the defendant, Cumberland, Maryland, and that the defendant received and paid for 650 tons and 2101 pounds of rails, and if the jury further believe from the evidence that the plaintiff shipped under said contract to Cumberland, Maryland, 331 tons and 151 pounds of rails, and if the jury further believe from the evidence that said 331 tons and 151 pounds of rails were scrap steel rails of the weight of 60 pounds and more per yard and of the length of five feet and over, then the defendant was bound to receive and pay for said rails.    And if the jury further find from the evidence that the defendant rejected said 331 tons and 151 pounds of rails and that the plaintiff thereafter re-sold said rails at the best price reasonably obtainable therefor, and if the jury believe from the evidence that it was not practicable for the plaintiff to re-sell said rails at Cumberland, Maryland, and that in order to properly re-sell said rails it was necessary for

the plaintiff to sell the same delivered at places other than Cumberland ; and if the jury believe from the evidence that thereby it became necessary for the plaintiff to pay freight charges upon said rails from Cumberland to the places at which the plaintiff may have sold said rails, if the jury find that said rails were properly sold at places other than Cumberland, then the plaintiff would be entitled to recover of the defendant such freight charges paid by the plaintiff in order to secure such re-sale; and if the jury find that in order to obtain possession of said rails and to ship the same from Cumberland, Maryland, it was necessary for the plaintiff to pay demurrage for car service charges accruing thereon by reason of the failure of the defendant to receive and unload the cars containing said rails, if the jury shall find that the defendant did so fail to receive and unload said cars, then the plaintiff would be entitled to recover said demurrage or car service charges so paid.     And if the jury further find that the plaintiff, upon resale of such rails, obtained a price therefor in excess of the price which the defendant agreed to pay therefor, then the jury should give the defendant credit upon such expenses and car services or demurrage for the advanced price so obtained by the plaintiff, and the jury may allow interest upon the balance if they shall find any balance so ascertained, from the time when the defendant should have received and paid for said rails.     (*Rejected.*)

The cause was argued before McSherry, C. J., Fowler, Boyd, Pearce, Schmucker and Jones, JJ.

*George Hoadly* and *Albert A. Doub*, for the appellant.

1. The Court was in error in ruling that the sales memorandum and three letters of October 5th and October 7th, and October 10th, did not make a contract in writing between the parties and in admitting parol testimony to enlarge and vary the terms of the contract.

Both parties undertook to put the contract in writing and believed that they had made a contract in writing, and it is not

either for the plaintiff or defendant to raise an objection now as to the fact that a written contract was made.    The defendant insisted at the trial that oral evidence was not admissible, but that the "Contract must speak for itself." The minds of the parties met, they thought the contract was in writing and defendant ordered the plaintiff to "rush the rails." The plaintiff and defendant submitted their prayers upon the theory that there was a written contract between them.    The very language of the defendant's prayers clearly shows an acknowledgment that the contract was in writing or there was no contract at all.    The conversation between Leonard Joseph and Joseph Schonthal, as given by Joseph Schonthal, took place on October 8th, and before the final consumation of the written contract, and therefore was merged into the written contract and was superseded by the written contract and ought to have been excluded as well as all testimony as to the nature of the defendant's business and of the knowledge that the plaintiff had of the nature of the defendant's business, and the letters of September 30th and October 2nd.    These letters were written before any mention was made of this contract.    They concerned contracts between the plaintiff and Joseph Schonthal as an individual ; they related to contracts made in which there were different specifications, and were therefore, irrelevant and calculated to mislead the jury as to the nature of the contract in issue.

Where parties have deliberately chosen to express their agreement in writing all oral stipulations must be regarded as merged by it.    *King* v. *Clogg*, 40 Md. 342; *Badart* v. *Foulon*, 80 Md. 590; *Hobbs* v. *Batory*, 86 Md. 70; *Neal* v. *Hopkins*, 87 Md. 24; *Delamater and Robinson* v. *Chappell*, 48 Md. 250.

In *Chanter* v. *Hopkins*, 4 M. & W. 399 (1 *Parsons on Contracts*, 622), the defendant sent to the plaintiff, the patentee of an invention, known as "Chanter's Smoke-Consuming Furnace," the following written order: "Send me your patent hopper and apparatus, to fit up my brewing copper with your smoke consuming furnace.    Patent right £15, 15s, iron work not to exceed £5, 5s, engineer's time fixing, 7s, 6d, per day." The plaintiff accordingly put up on the defendant's premises

one of his patent furnaces, but it was found not to be of any use for the purposes of brewery, and was returned to the plaintiff. It was held (no fraud being imputed to the plaintiff), that there was not at an implied warranty on his part that the furnace supplied should be fit for the purposes of brewery; but that, the defendant having defined by the order the particular machine to be supplied, the plaintiff performed his part of the contract by supplying that machine, and was entitled to recover the whole £15, 15s, the price of the patent right.

In the correspondence after October 8th, it was necessary that the defendant should refer in the correspondence to this requirement that the rails should be suitable for re-rolling into light section rails, if these were wanted, but there is no mention of this requirement in the purchase memorandum or in any of the other letters written by the defendant to the plaintiff. The parol evidence which the defendant has offered does not relate to some independent, collateral or explanatory verbal agreement, about which the written contract is silent and distinct from the written one which was made at the same time. The correspondence contained the whole contract between the parties relating to this subject-matter, and therefore, the testimony ought to have been excluded. *Warren Glass Co.* v. *Keystone Co.*, 65 Md. 547.

2. If the contract was partly oral and partly written it was for the jury and not for the Court to determine what was the contract between the parties. *Roberts* v. *Bonaparte*, 73 Md. 191; *Eureka Co.* v. *Copper Co.*, 78 Md. 180; *Columbian Iron Works* v. *Douglas*, 84 Md. 65.

3. There was no implied warranty that the rails would be re-rolling rails such as defendant could use in its mills for re-rolling into light section rails. If the contract was wholly in writing there could be no implied warranty in this case for scrap steel rails, a known and defined article sold in the market and classed as scrap steel rails was purchased. They were to be of certain dimensions and certain weight and the specifications were fully set out in the contract. When spe-

cific articles of a known, defined and described class are sold in the market, there can be no implied warranty. Where the contract of sale is in writing and contains no warranty, there parol evidence is not admissible to add a warranty. *Jones* v. *Just*, Law Reports, 3 Q. B. 202.

A *fortiori* this would be true where a known, described and defined thing was ordered of a dealer, because the rule is general that implied warranties are more readily created as against a manufacturer of the article than as against a mere dealer in the article. *Jerecki Mfg. Co.* v. *Kerr*, 165 Pa. 529; *Rasin* v. *Conley*, 68 Md. 59.

If, however, the contract was partly in writing and partly in parol and the contract provided that the rails should be suitable for use by the defendant for a specific purpose, there would be no implied warranty but there would be an express warranty. If the contract, therefore, provided for scrap steel rails that would answer the purpose of the defendant, and the sole use of the rails was to manufacture and re-roll them into light section rails and the rails delivered did not comply with this contract, the non-compliance was a breach of the contract. If the contract was wholly in writing and the plaintiff furnished rails that complied with the specifications set out in the paper-writing, there was no breach of contract and there could be no warranty. If, however, as contended now by the appellee, the contract was partly in writing and partly in parol and it was the duty of the plaintiff to furnish scrap steel rails suitable for defendant's purposes, and the rails furnished did not comply fully with the requirements of the contract, partly oral and partly written, there was a breach of the contract but no breach of implied warranty. In the well considered case of the *Columbian Iron Works* v. *Douglas*, 84 Md. 65, *supra*, this distinction is clearly set forth and the Court has said that if the contract was both in writing and in parol then the question was a question as to the construction of the contract and was for the jury. The proof shows conclusively that the plaintiff furnished the known, described and defined articles set forth in the written contract, and the preponderance of

proof, we submit, shows the fact that the rails delivered even complied with the contract made in writing and in parol, as contended for by the appellee, but this would be a matter for the jury to pass upon and not for the Court. The Court did not submit the construction of such contract to the jury.

4. There is no testimony in the case legally sufficient to entitle the defendant to recover upon its plea of set-off, and the prayer of the plaintiff asking the Court to instruct the jury that their verdict upon the plea of set-off should be for the plaintiff ought to have been granted.

5. The letters of September 30th, 1901, and October 2nd, 1901, were clearly inadmissible. They related to other contracts made with another party prior to the contract sued on wherein there were other and different specifications. The evidence that Fechheimer ordered Bender to ship rails away in the night time and feared attachments could in no way reflect on the issue and was irrelevant and calculated to prejudice and mislead the jury. There is no theory upon which these letters are admissible unless the learned Court below ruled correctly in admitting them to show custom between the parties. The letters are dated before the negotiations for this contract began, they concern other contracts with Joseph Schonthal and not with the defendant. There is nothing technical or ambiguous about the contract and the evidence was inadmissible as being *res inter alios acta*, and wholly irrelevant. *Gibney* v. *Curtis*, 61 Md 195.

*James A. McHenry* and *E. N. Huggins*, for the appellee.

Can it be said that the parties finally agreed, and that these four papers constitute the contract? Each succeeding paper shows a disagreement and the final one raises a dispute over the most material element of the contract, viz., the character of the material. It was a case of backing and filing and never getting together. The appellant in this case declared originally on a contract for 1000 tons steel rails "free from frog, guard and switch;" the issues were joined and the case tried, but when the testimony had been closed, appellant amended

the declaration by striking out the clause "free from frogs, guard and switches."

Appellant knew or ought to have known what the contract was when this suit was brought, yet the contract declared on, differed in a most material particular from the contract set forth in the prayers.    This is a significant item of proof that there was no understanding of the parties, or meeting of minds, as to the kind of rails.    Joseph Schonthal, the president of the company, testified that his company bought and appellant agreed to ship re-rolling rails, which he explains, means rails "free from frog, guard and switch ends."    Appellant knew appellee's business at Cnmberland and knew that it had no use for any but re-rolling rails.    We claim there was no meeting of the minds of the parties, shown by the sales memorandum and the three letters, and the Court was right in rejecting the prayers.    *Hand* v. *Evans' Marble Co.*, 88 Md. 226.

If the contract is out of the case, the appellant could only recover on the common counts, for goods sold and delivered, and, as stated above, in selling rails to a buyer, whose business was re-rolling old rails into lighter sections, and whose business was known to appellant at the time, there was an implied warranty that the rails were suitable for the purposes for which they were bought, and the evidence was that frogs, guard and switch ends were not such, but that they must be free from such defects.    The appellee properly rejected this bad material and has a right to recover the value of same in this action.

McSHERRY, C. J., delivered the opinion of the Court.

This is an appeal from the Circuit Court for Allegany County.    Suit was instituted in that Court by the appellant, the Joseph Joseph & Brothers Co., a corporation formed under the laws of the State of Ohio, against the appellee, the Schonthal Iron and Steel Company of Cumberland, a corporation formed under the laws of Maryland, to recover damages for an alleged breach by the last-named company of a contract made by it for the purchase of one thousand tons of scrap

steel rails from the first-named company.   The breach con-
sisted in the refusal of the Iron and Steel Company to take
331 tons of the total one thousand tons covered by the con-
tract set up by the appellant.   The declaration as first filed
contained two counts and described the material purchased by
the Steel and Iron Company as "scrap steel rails free from
switch, frog and guard rails."   Subsequently, an additional
count was put in and later on the common counts for goods
bargained and sold, etc., were added.   After the trial had be-
gun an additional count declaring on a written contract was
filed, and the words "free from frog, guard and switch rails"
contained in the original counts were, on motion, stricken from
the declaration.   The appellee, the Steel and Iron Company,
pleaded that it was never indebted as alleged; that it never
promised as alleged; that it satisfied and discharged the plain-
tiff's claim by payment and in addition it put in a plea of set-
off to the plaintiff's claim.   Upon the issues joined the case
went to trial before a jury, and during its progress there were
seven exceptions reserved to the rulings of the Court; and the
questions with which we have to deal are set forth in the bills
of exception contained in the record.   It will perhaps be more
convenient, and certainly it will tend to brevity, if we invert
the order in which the questions arise on the record and deal
with those presented by the last exception first.   The last
exception includes the rulings of the trial Court on the prayers
presented by both sides for instructions to the jury and also
its rulings on several motions made to strike out testimony
which had been admitted subject to exception.

The fundamental question lying at the root of the whole
controversy is :   Was there a contract between the parties at
all ?   On the part of the plaintiff, the appellant here, it is in-
sisted that there was and that it is evidenced by certain writ-
ings; namely, a sales memorandum dated October 4th, 1901,
a letter dated October 5th, another letter dated October 7th,
and finally a third letter dated October 10th.   Upon the hy-
pothesis that these writings evidenced the whole contract be-
tween the parties with respect to the sale by the one and the

purchase by the other of one thousand tons of steel scrap rails, the first, second, third, fourth, sixth and seventh prayers of the appellant were framed.    If that hypothesis be erroneous, the Court below was clearly right in rejecting those prayers. If the contract was evidenced only by the writtten papers referred to, its construction was for the Court.    If it was evidenced partly by the written papers and partly by parol, then it was for the jury to determine what the contract actually was.    *Roberts* v. *Bonaparte*, 73 Md. 191.    Inasmuch as the appellant's theory was founded on the assumption that the writings alone evidenced the contract, it will be necessary to set out those writings and briefly examine them.

It appears that in consequence of a telephonic communication from the Steel and Iron Company to the Joseph Joseph & Brothers Co., transmitted from Cumberland to New York on October 4th, 1901, the latter company forwarded to the appellee on the same date the following sales memorandum.

New York, Oct. 4th, 1901.

S. M. No. 306.

Messrs. Schonthal Iron & Steel Co.,

Cumberland, Md.

We have sold to you (see letter).

About 1000 tons scrap steel rails, five feet and up (with the exception of two hundred tons 56 lbs and up, three feet and over), original section 60 lbs and over, at $20.50 gross ton, F. O. B. Cumberland, Maryland.

Terms cash V-S-B-L or order.

The Jos. Joseph & Bros. Company.

On the following day the Iron and Steel Company replied in a letter which contains the following paragraph:

Cumberland, Md., Oct. 5th, 1901.

Jos. Joseph & Bros. Company,

New York.

Gentlemen:—

We acknowledge receipt of your sales memo. No. 306 dated Oct. 4th, of about 1000 tons scrap steel rails to be five feet and up, none to be less than 60 lbs and as much over as you care to ship in section, with the exception of 200 tons of 56's and up, of the P. R. R. pattern that was to come off the Central railway of N. J., this 200 tons we agreed take three feet

and over, but there must be none of these rails coming to us that was originally lighter when first rolled than a 60 lb section, these rails to be delivered cash B-L. or order at $20.50 gross ton f. o. b. cars our mills, B. & O. tracks, Cumberland, Maryland.

Schonthal Iron and Steel Company.

J. H. Tatnall, G. M.

On the 7th of October the Jos. Joseph & Bros. Co., replied as follows:

New York, Oct. 7th, 1901.

Schonthal Iron and Steel Company.

Dear Sirs:  As to the confirmation of 1,000 tons of scrap steel rails, last sold you, as stated in our contract, 200 tons of these rails are to be 56 lbs and up original section, and over three feet in length; the balance are to be 60 lbs and up, five feet and over in length.   As to your remark "as to their coming from the P. R. R." this is incorrect, as we expect to ship them from the Southern Ry.   This, certainly, is an immaterial point, however.   Yours very truly,

Jos. Joseph & Brothers Co.<br>Leonard Joseph, Vice Prest.

And on the 10th, the Iron and Steel Company mailed a letter from which the following is an extract:

Cumberland, Md. Oct. 10th, 1901.

Jos. Joseph & Bros. Company,
       New York.

Gentlemen:—*  *  *

"We note what you say in regard to the 1,000 tons that the 200 tons of three feet and up in lengths.   This we note on the contract which is immaterial to us where they come from but it is understood that they are rails taken up from the tracks and not rails picked up from sidings along the road. Replying further to yours Oct. 7th, in which you advise that you are going to ship us some heavy rails, weighing 76 and 80 lbs per yard, it will be all right to ship these rails as we can use them in the future.

Regarding drafts we will take this up as fast as the cars appear in sight, but you certainly would not expect us to pay drafts and wait a week or ten days or longer, before rails reached Cumberland.   We have no desire to hold your drafts at all but will give them just as prompt attention as we can when rails appear in sight.   Yours truly,

Schonthal Iron & Steel Co.,<br>Geo. H. Tatnall, G. M.

It will be observed that if these four papers alone evidence the contract there was no meeting of the minds of the two negotiating parties.  There was no *consensus ad idem.*  The sales memorandum states that the appellant had sold to the appellee one thousand tons scrap steel rails, of certain dimensions, "original section, 60 lbs and over."  The appellee's letter of October 5th, does not accept unqualifiedly the terms contained in the sales memorandum, but on the contrary adds a new condition, namely, that the scrap steel rails were to be of the P. R. R. pattern and were to come off of the Central Railway of New Jersey.  In the reply of October the seventh the appellant not only does not accede to this new suggestion, but distinctly declines to do so, for it says in the letter of that date "as to your remark about their coming from the P. R. R. this is incorrect as we expect to ship them from the Southern Railroad."  Up to this point it seems reasonably clear that there had been no distinct agreement as to the pattern of the material or the place from whence it was to come, whilst by the letter of October 10th, the condition as to the *place* from which the rails were to come, was waived, a new term was injected, because the Iron and Steel Company distinctly stated that "it is understood that" the rails to be shipped are to be "rails taken up from the tracks and not rails picked up from sidings along the road ; "  and it nowhere appears that this new term was ever accepted by the appellant company.  In point of fact this series of letters consisted of propositions and counter propositions and nowhere brought the parties to a distinct and definite conclusion. Various terms were suggested but the minds of the parties ultimately never met, and in this particular, the case is not unlike that of *Johnson* v. *Corbett,* 95 Md. 746.  Again there does not appear to have been a definite understanding with respect to the time of payment.    The sales memorandum states: "terms, cash vs. bill of lading, or order" which we take to mean that a draft was drawn and attached to the bill of lading and was payable on presentation without reference to whether the material had arrived or not; whereas in the letter of October 10th, the following statement appears: "regarding

drafts, we will take this up as fast as cars appear in sight, but you certainly would not expect us to pay drafts and wait a week or ten days or longer before rails reach Cumberland. We have no desire to hold your drafts at all but will give them just as prompt attention as we can when the rails appear in sight." This proposition varied widely from the time for payment set forth in the sales memorandum. With no distinct agreement as to the time of payment, and with no assent to the new term suggested in the letter of the 10th in regard to the rails being taken from the main track and not from the sidings, it is impossible to conclude that there was a definite agreement evidenced by these papers. And so the Court ruled when it rejected the appellant's first, second, third, fourth, sixth and seventh prayers, and its ruling in this behalf is, therefore, free from error.

The tenth, or only other rejected prayer of the appellant, asked the Court to instruct the jury that there was no evidence in the case legally sufficient to entitle the appellee to recover upon its plea of set-off and that the verdict upon that plea must be for the appellant. This is a demurrer to the evidence offered by the defendant in support of its plea of set-off. Evidence was introduced tending to show that some of the rails and other scrap contained in the 678 tons shipped to, and paid for by, the appellee were defective and not fit for use, and there was also evidence tending to show the quantity and the value of that inferior material. The evidence so adduced was competent as tending to prove the set-off. A witness produced by the defendant, the appellee, testified that he had inspected every car load of material consigned to the appellee, and hauled to Cumberland, and that every car which he inspected contained materials of light weight, short pieces, switch frogs and guard-rails and that class of material. This was true not only as respects the cars which had been unloaded and paid for but also of the cars which were rejected and not unloaded. It was also proved that the inferior material contained in the cars which had been paid for was carefully laid aside and marked and that the price which had

been paid for it was $634.31.   It was further shown by admissions made by an agent of the appellant that the material, "all the material, was not up to the specifications;" and the agent who is said to have made those admissions saw some of the material unloaded and was in Cumberland nearly a month endeavoring to adjust the dispute between his company and the appellee.   It was further proved that the same agent stated to the chief clerk of the B. & O. freight office in Cumberland that all the cars refused by the Schonthal Iron and Steel Company did not come up to the specifications.   It was for the jury to say whether the testimony was worthy of credit and by the verdict they rendered they evidently believed that it was true.   This evidence being in and tending to prove the issue which it was adduced to establish, it would have been error had the Court withdrawn it from the consideration of the jury by the granting of the prayer we are now considering.   Consequently the Court was right in rejecting that prayer.

It was contended with much earnestness in the oral argument that the Court should have left to the jury to find the terms of the contract if the whole of the terms of the contract were not evidenced by the writings to which allusion has already been made.   But it must be borne in mind that the Court was not asked by the appellant for such a ruling.   On the contrary, the whole theory of the appellant's case was based upon the hypothesis that the contract was evidenced exclusively by the writings.   The Court was under no obligation of its own motion to give an instruction to the jury founded upon the theory that the contract was evidenced partially by writing and partially by parol.   Had it been asked to so instruct the jury and had the evidence justified the granting of such an instruction, and had an appeal been taken because of a refusal by the Court to grant it, a different state of case would then have been presented for review.   As no such question is before us we need say nothing further in regard to it.

The only prayer granted at the instance of the Iron and

Steel Company was its sixth, whereby the jury were told that if they should find from the evidence that after the date of the alleged contract sued on and before any rails had been shipped to the appellee, the appellant agreed with the appellee to sell and deliver one thousand tons of re-rolling rails and if they should further find that the 13 car loads of material for which damages are claimed by the appellant in this case, were not re-rolling rails, then the appellant was not entitled to recover damages for the refusal of the appellee to receive the same. This prayer was not excepted to on the ground that there was no legally sufficient evidence to support its hypothesis. It was obviously intended to present the appellee's version of the contract of purchase and sale and if there was evidence tending to support its hypothesis, its legal conclusion was unquestionably right. There being no special exception founded upon the want of evidence to support any of its hypotheses, we must assume that there was such evidence in the case, and so assuming, there can be no question that the appellant was not entitled to recover damages arising out of a refusal by the appellee to accept the rejected material, if, in point of fact, the material shipped was not fit for re-rolling rails when the contract had relation solely to material that *was* fit for that purpose. A great deal of the argument at the bar and in the brief of the appellant was intended to convince the Court that there was no implied warranty that the material sold by the appellant would be fit for re-rolling, and, therefore, that the delivery of scrap which was not suitable for re-rolling was not a breach of warranty, and, consequently, that the appellee was not justified in refusing to receive it. The doctrines applicable to warranties are not involved in this case. It was said by LORD ABINGER in *Chanter* v. *Hopkins*, 4 M. & W. 399, that "A good deal of confusion has arisen in many of the cases upon this subject, from the unfortunate use made of the word warranty. Two things have been confounded together. A warranty is an express or an implied statement of something which a party undertakes shall be a part of a contract, and though part of the contract, *collateral to the express object of it.*

But in many of the cases, the circumstance of a party selling a particular thing by its proper description has been called a warranty, and the breach of such a contract a breach of warranty; but it would be better to distinguish such cases as a non-compliance with a contract which a party has engaged to fulfill; as if a man offers to buy peas of another and he sends him beans, he does not perform his contract; but that is not a warranty; there is no *warranty* that he should sell him peas, the *contract* is to sell peas and if he sells him anything else in their stead it is a non-performance of it." Precisely this principle was recognized in *Columbian Iron Works* v. *Douglas*, 84 Md. 65; and *The Warren Glass Works* v. *The Keystone Coal Co.*, 65 Md. 547. Before a defendant can be compelled to take anything in fulfillment of a contract of sale it must be shown not merely that it is equally as good as the article that was sold, but that it is the *same* article he has bargained for and none other. *Bowes* v. *Shand*, 2 App. Cas. 455. In other words, if the sale is of a described article, the tender of an article answering the description is a condition precedent to the purchaser's liability, and if this condition be not performed the purchaser is entitled to reject the article, or, if he has paid the purchase price, he is entitled to recover back the price as money had and received for his use. 2 *Benj. on Sales*, sec. 918. Clearly then, if the appellee purchased only such material as was suitable for re-rolling into lighter rails, it was under no obligation to accept scrap which was not fit for that specific use. The delivery of unfit material was not a breach of warranty, but a breach of the contract by the vendor, and the latter has no ground to complain if the vendee declined to accept that which it did not buy.

We now come to the motions to strike out the testimony which had been admitted subject to exception; and these present the same questions as some of those raised by the bills of exception. There were six of these motions, but we need only allude to those which were overruled. The first and second present substantially the same questions as are raised by the third and fourth bills of exception. A witness for the

appellee had testified as to conversations with the vice-president of the appellant company in the city of New York on the 8th of October, 1901, in reference to the kind of material that the appellee needed for use at its mill in Cumberland. In that conversation other contracts for additional material were made but those contracts are not involved in this controversy. It was distinctly stated by the witness to the vice-president of the appellant company that the business in which the Iron and Steel Company was engaged was that of re-rolling rails, that is to say, of rolling into lighter sections old rails of heavier weight, and it was further stated that the Iron and Steel Company was not using anything but long-length rails for re-rolling. This testimony and other of a kindred character was admissible under the appellee's theory of the case, as it tended to show that the contract actually made was for the sale and delivery of material fit for re-rolling into light section rails; and if such was in fact the contract, the appellee was under no obligation to receive rails which were not fit for re-rolling. It was competent for the appellee to show that the appellant was aware of the kind of business in which the appellee was engaged, because that was a circumstance from which the jury might find that the contract actually entered into was the one for which the appellee contended and not the one on which the appellant insisted.

The third motion to strike out evidence embraces the same question raised by the fifth bill of exception and has relation to the testimony given as to contracts other than the one sued upon and the sixth bill of exception presents a kindred objection to the admissibility of certain letters written by the appellant to the appellee. In one of the letters the Iron and Steel Company was distinctly told that "any switch, guard and frog or short rails, we do not expect you to take," or as stated in the other of those letters "the material was to be free from switch, frog and guard rails and you do not have to take them otherwise." The letters and the other testimony bearing upon the independent contracts not involved in this controversy were admitted by the Court upon the theory that

they tended to show that the appellant knew the character of business the appellee was engaged in, and of course, therefore they tended to strengthen the appellee's version of the contract. In that light they were admissible and the motion to strike them out was properly denied, and the ruling in the sixth bill of exception was correct.

Of the 13 cars which were rejected some were subsequently sent by the appellant to Syracuse and others to Tonawanda, New York. The contents were there sold. Negotiations had been going on for upwards of a month in Cumberland in regard to these rejected cars. Fechheimer, who was a representative of the appellant, finally failing to induce the appellee to take these cars of rejected material, requested the clerks and agents of the railroad companies in Cumberland to ship the cars away at night, and a witness, Bender, who was an agent of the B. & O. R. R. testified, that he made out the bills of lading in Fechheimer's room at the Queen City Hotel behind locked doors because Fechheimer was apprehensive that an attachment might be levied upon the material. This evidence did not tend to prove any issue in the case, but it is not perceived how it could have prejudiced the appellant in the slightest degree. To justify a reversal two things are essential. There must be error and there must be injury; and unless it is perceived that the error causes the injury there can be no reversal merely because there is error. The refusal of the Court to grant the fifth motion, and its ruling in the second bill of exceptions are, therefore, no grounds for reversing the judgment. Neither the admission nor the exclusion of evidence which does not appear to have affected the result or to have prejudiced the appellant, is a sufficient ground for the reversal of a judgment. *B. & O. R. R. Co.* v. *Strunz*, 79 Md. 335.

The only remaining inquiry included in the seventh bill of exception is the objection made to the oral comments of the Judge spoken in the presence of the jury when disposing of the prayers. After the Judge had passed upon the prayers and the motions, one of the counsel for the appellant arose

and said: "We respectfully ask leave to except to the rulings of the Court in the rejection of such of the plaintiff's prayers as were rejected, and the granting of such of the defendant's prayers as were granted, and *to the comments of the Court in the ruling upon the prayers* in the presence of the jury." The Judge at once said: "If there was anything said objectionable, it was not intended. What particular matter was objectionable?" The counsel replied: "I do not recall; it is a common practice and is a general objection." The exception as formally reserved is "to the opinion expressed by the Court on the prayers in the presence of the jury." This is entirely too general and indefinite. If the Judge made any remark that ought not to have been made we fail to find it in the record. When he asked counsel what it was he objected to, the latter was unable to state. Had anything objectionable been pointed out to the Judge he would certainly have corrected it. It is probably a safer practice for a Judge when the jury are present to make no comments in disposing of prayers unless he intends to withdraw the case from their consideration; but if he sees fit to give his reasons for his rulings on the prayers and in doing so makes statements prejudicial to a party, an exception may be taken, but the specific statement objected to must be distinctly indicated in the bill of exceptions.

We now come to the remaining bill of exception namely, the first, which includes a ruling not covered by what has been already determined. Leonard Joseph, the vice-president of the appellant company, was the first witness placed upon the stand in the Court below. Upon cross-examination it was shown that he had sometime previously given his testimony to be used in this case under a commission issued to New York, and after many other questions had been propounded to him, he was asked whether on the occasion when he was interrogated in New York he had not procured his stenographer to become a witness in order to corroborate an interview and certain circumstances then testified to, by him, Leonard Joseph? This question was objected to, the objection was overruled and the first exception was reserved. He answered that

he did not.   In his testimony given under the commission the witness had testified that Mr. Joseph Schonthal had made the contract for the one thousand tons of steel scrap with the witness at the latter's office in New York on October the fourth, 1901; and it was with regard to the interview he said took place then, and the circumstances which he stated occurred at that time, that he was asked upon his cross-examination the question objected to.   It turned out that he was in error in his testimony given under the commission.   He admitted in his oral testimony given in the trial Court that Joseph Schonthal had not been at his office on the fourth of October, but stated that he had been there on the eighth.   If he did induce his stenographer to corroborate his erroneous statement it was competent for the appellee to show that fact, as it was a circumstance that reflected on his credibility.   But he answered that he did not procure his stenographer to support his mistake, and that ended the inquiry.   No injury was done by permitting the question to be asked, and even if there had been error in allowing it to be put, that error would not warrant a reversal.

The case went to the jury on the pleadings and under the instructions to which we have alluded and a verdict was returned in favor of the defendant, the appellee, for $121.66, which is the precise difference between $634.31 the sum actually paid for material which the appellee had rejected upon its delivery, but had previously settled for when it cashed the drafts before the scrap reached Cumberland, and $512.65, the amount due by the appellee for material accepted and not paid for.   Upon that verdict judgment was entered and from that judgment the pending appeal was taken.

As we find no reversible error in the rulings excepted to, the judgment must be affirmed and it is so ordered.

*Judgment affirmed with costs above*
*and below.*

(Decided June 8th, 1904.)