JONES, ET AL. *v.* CALVIN B. TAYLOR BANKING COMPANY

[No. 216, September Term, 1968.]

*Decided May 8, 1969.*

The cause was argued before HAMMOND, C. J., and MAR-
BURY, McWILLIAMS, FINAN and SMITH, JJ.

*John G. Noppinger,* with whom was *John B. Robins* on the
brief, for appellants.

*John W. T. Webb,* with whom were *Thomas L. Lilly* and
*Webb, Burnett & Simpson* on the brief, for the appellee.

SMITH, J., delivered the opinion of the Court.

This case arises in part because of the willingness and de-
sire of a bank in a rural area to do that which it reasonably could
to foster economic development in its community. Appellee
(Bank) is located at Berlin in Worcester County. Sometime in
1960 Atlantic Trailer Corporation (Atlantic), a manufacturer
of mobile homes and trailers, moved from the Baltimore area
to Berlin. It employed approximately 100 people, a substantial
number in a town having a 1960 population of 2,046.

Appellants, J. Walter Jones (Jones) and Wade H. Gowl
(Gowl), were president and vice-president, respectively, of At-
lantic. In February, 1961, Atlantic was having difficulty ob-
taining essential supplies. Its officers came to the Bank seeking
assistance in obtaining relief from their credit problems. They
conferred with Reese F. Cropper, executive vice-president of
the Bank. He testified in part as follows:

> "[In] February, after they had operated a few months
> and were manufacturing mobile homes, all during those
> several months, from 1960, Mr. Jones and Mr. Gowl
> personally came to my desk and said that they were
> experiencing some difficulty of obtaining supplies, that
> they were short of operating capital to the extent that
> they would like to originate a plan whereby the bank
> could be of assistance to them with suppliers by estab-
> lishing the bank as an escrow agent and, whereby, they
> would take orders, sell the trailers to their dealers,
> and on order, and that they would like for us to act
> as an escrow agent or intermediary that could get their

suppliers to preship supplies to their plant to go into these trailers, subject to the order and certification of origin that was existing with the bank, and wanted to know if I would agree that the bank would help in their dilemma.

"I knew that they were short and tight for operating funds. They were an employer of one hundred people in our territory and we naturally were anxious to maintain an industry there that would continue that employment as well as try to help Mr. Gowl and Mr. Jones and the Atlantic Trailer Corporation.

"I agreed that we would assist them by going into this arrangement, but I told them that there would be some liability and trouble and that we would have to have some guarantee that—or some contingency that we should have in connection with it, and they voluntarily offered to put up their personal note, in addition to what liability that the Atlantic Corporation may have had for the bank to guarantee and stand between its suffering any loss whatsoever from any transaction in this connection or any other situation that they may be dealing with back in this type position.

"They were willing that day personally to guarantee the bank against any loss. There were no limitations mentioned nor were there any limitations mentioned to us, nor has there ever been any limitations of their personal liability to us for any loss or out-of-pocket money that we may lose as a result of our operations with the Atlantic Trailer Corporation."

At one point on redirect examination of Mr. Cropper the record is as follows:

"Q. Now, Mr. Noppinger used the language that this note was to protect you from any loss with respect to dealings with Atlantic Trailer; was the note intended to secure anything more than any loss that might be incurred in connection with this financing transaction? A. Oh, yes, sir. It was understood that anything — because of the knowledge that they had of their capital

chart, they were striving to get funds back quickly from their sales.

"They were hounded by suppliers' refusal and, they were searching for every way possible to obtain the return of funds for sales that would relieve this capital shortage situation, which they were frank to admit. And, this note was offered voluntarily and the amount was arrived at, I think, as agreeable between all of us, that they would give this to guarantee the bank against anything that they may do or would do that would protect them against the loss from any situation, including the checks that they were then operating with or the account or the agreement as made in the escrow situation."

Pursuant thereto the note of Jones and Gowl dated February 20, 1961, in the amount of $10,000.00 payable on demand was delivered to the Bank. Thereafter there were 46 transactions handled under this unique arrangement. Illustrative of the procedure followed is a letter addressed by Gowl to Mr. Cropper of the Bank on May 17, 1961, relative to the Trinity High School transaction, concerning which more will be said. That letter said:

"In accordance with our agreement reached with your bank on Saturday, February 18th, 1961, we are enclosing Trinity High School purchase letter dated May 12, 1961, covering two (2) mobile classroom trailers in the amount of $13,760.00. We hereby assign the accounts receivable over to the Calvin B. Taylor Banking Company to be placed in a special account to be used only for those checks held by you in escrow. We have notified Trinity High School of this assignment and it is our understanding that you will notify the following suppliers of Atlantic Trailer Corporation that you have received from us checks made out to them in the amounts indicated and that the total of these checks do not exceed the amount of the accounts receivable assigned for this purpose.

"The mobile classroom trailer referred to on the en-

closed purchase letter has been shipped with terms based on Net on Delivery. We anticipate with reasonable certainty receipt of this check during the period between July 6th and July 13th, 1961."

The procedure adopted called at the same time for a letter to go out from the Bank to various suppliers illustrated by a letter to Brady Plywood Corporation dated March 29, 1961, which read as follows:

"On this date we have received from Atlantic Trailer Corporation a check listing your company as payee in the amount of $2800.00. This check will be held in escrow by the Calvin B. Taylor Banking Company and applied against McCarthy Trailer Sales order for serial number 61-2970. All the monies to be received from this accounts receivable have been assigned to this Bank for special payments such as yours. The total of all checks to Atlantic suppliers charged against this accounts receivable does not exceed the amount of the accounts receivable.

"We have been informed that payment is anticipated between April 17th and April 24th."

At the same time there would be delivered to the Bank checks as illustrated by the following letter from Atlantic to the Bank dated May 17, 1961:

"We are enclosing herewith our check number BS-1182 listing Jalousies of Ohio Company as payee in the amount of $5346.10. We ask that you hold this check in escrow to be released upon receipt of check covering Trinity High School purchase letter assigned to your Bank under our letter of 17 May 1961."

As a part of the transaction Atlantic prepared the letters from the Bank to the suppliers. Normal procedure was for all of the papers relative to one transaction to be delivered at one time. Checks from the customers of Atlantic went to Atlantic with the understanding that Atlantic would see to their deposit in the escrow account. Thereafter, the Bank mailed checks to the suppliers that had been previously delivered to the Bank.

The transactions continued up through June 19, 1961. Mr. Cropper testified that there came the time when suppliers began to call the Bank asking where their checks were. In response to a question as to what evidenced the beginning of trouble for the Bank, Mr. Cropper testified:

"A. The suppliers began to call us as to where their checks were. We told them that they had the checks, we were waiting for the funds to come from the dealer who was to receive the trailer.

"We would then check with Atlantic Trailer. We would find they, in some cases, had received the check but had not brought it in on the escrow account to us. Therefore, we were not able to disburse the checks."

In June, 1961, the Bank itself began to notify the purchaser of the assignments and to direct the purchaser to make payment pursuant to the assignment to the Bank. This was done with reference to the Trinity High School transaction. Thereafter the Bank was notified by the Trinity High School officials that the trailers were not delivered and finished according to the contract, that they were sitting on the high school grounds and the school would not accept them until they were put into condition in accordance with the contract.

Atlantic executed a deed of trust for the benefit of creditors. The Circuit Court for Worcester County assumed jurisdiction thereunder on August 9, 1961. It was at approximately this time that the Trinity High School officials gave notice to the Bank. The Bank authorized the school officials to complete the trailers, the cost thereof to be deducted from the original purchase price. This amount was $2166.63. Accordingly, the Bank received the sum of $11,093.75 from Trinity High School. It charged $307.71 for its expenses against this balance and then divided the remaining sum ratably among the three creditors for whom it had been previously issued checks, issuing its own cashier's check therefor. This was accomplished on November 3, 1961.

On August 9, 1961, at the time the Bank learned of the deed of trust for the benefit of creditors there was the sum of $2328.08 on deposit in the escrow account. Atlantic was buying

the land on which it was operating from a corporation known as Peninsula Industries, Inc. The land was being purchased on a land installment contract. The contract had been assigned to the Bank as collateral for certain other obligations. Atlantic was in arrears in its payments under the contract on August 9. The Bank closed out the escrow account by charging that account with an offset and crediting an obligation evidenced by the note of Peninsula Industries, Inc., giving credit to Atlantic simultaneously on its land installment contract.

On December 8, 1961, a petition was filed against Atlantic in the United States District Court for the District of Maryland asking that it be adjudged a bankrupt. It was so adjudged on February 1, 1962, and Joseph A. Waldman, Esq., was named trustee in bankruptcy on February 27, 1962.

The trustee demanded restitution from the Bank of the sum of $2328.08, above mentioned, which it had applied from the escrow account and also demanded payment to the trustee of the entire amount of $13,760.00 owing under the Trinity High School contract. The theory of the trustee was that the allowance to Trinity was unauthorized and that payment of the sum of $307.71 to the Bank and the payment of the aggregate sum of approximately $11,000.00 to the Department of Employment Security and two other creditors pursuant to the prior assignment was a preferential treatment in contravention of the deed of trust for the benefit of creditors and recoverable under the bankruptcy act.

Because of certain conflicts of interest the Bank's regular counsel was not available to them. Accordingly, the Bank retained John W. T. Webb, Esq., of the then firm of Webb & Travers, as counsel in September of 1962. The Bank refused to make the payment demanded by the trustee in bankruptcy. That trustee then filed suit against the Bank in the Circuit Court for Worcester County on July 31, 1963. The Bank paid the trustee in bankruptcy the sum of $5000.00 on July 6, 1964, in settlement of the trustee's demand and the case was dismissed. The Bank recovered from Peninsula Industries, Inc., the sum of $2328.08 previously paid and for purposes of this case disregarded the sum it previously had recovered of $307.71 for its

services on the Trinity High School matter, leaving a net loss calculated by the Bank of $2364.21.

On December 2, 1963, the Bank entered in judgment against Jones and Gowl the $10,000.00 note which was given under date of February 20, 1961. They seasonably filed a motion to strike the judgment. The matter ultimately was removed to the Circuit Court for Wicomico County for trial. It was tried by the court without a jury.

The trial judge entered a judgment in favor of the Bank against Jones and Gowl in the amount of $4294.42 (the above amount of $2364.21 plus the sum of $1930.21 due Webb and Burnett as their attorney's fee for representing the Bank in connection with the claims of the trustee in bankruptcy against the Bank and other matters growing out of the escrow transaction). The note by its terms provided in the usual language for payment of "ten percent of the amount of said judgment as collection charges." The trial court specifically refused to enter a ten percent collection fee. Of the judgment, $2364.21 was to bear interest from December 2, 1963, (date of the original judgment) with remainder to bear interest from the date of final judgment. The Bank entered no appeal.

Jones and Gowl here appeal contending that the agreement between the parties was one of indemnity and must be complied with in accordance with its terms and that improper and wrongful action by the Bank formed the basis for its subsequent loss which is insufficient or no consideration for the note.

A motion was made pursuant to Maryland Rule 18 c as then in effect for a statement of the grounds for the trial court's decision. Pursuant thereto, the trial judge filed a memorandum which states in pertinent part:

> "When testimony was taken on May 23, 1968, it was revealed that J. Walter Jones and Wade H. Gowl were officers of the Atlantic Trailer Corporation, a corporation engaged in the manufacturing and assembling of trailers and doing business in Worcester County, Maryland. The evidence also disclosed that the Defendants in this case, namely, J. Walter Jones and Wade H. Gowl approached Mr. Cropper, the Ex-

ecutive Vice-President of the Calvin B. Taylor Banking Company, of Berlin, Maryland, and proposed to him the proposition whereby Jones and Gowl signed a Confessed Judgment Note in the amount of $10,000.00 to arrange an escrow account with the Calvin B. Taylor Banking Company. It was Mr. Cropper's testimony and his understanding from the conversation that this note was to cover any losses that the Bank might incur in any of its dealings with the Atlantic Trailer Corporation.

"It was the finding of this Court from all the evidence heard that this note was to cover any and all losses incurred by the Bank in any of its dealings with the Atlantic Trailer Corporation and finding such to be the case, I entered a judgment for the Plaintiff.

"Judgment was entered for the Plaintiff in the amount of $4,294.42, of this amount, I found that the Calvin B. Taylor Banking Company had lost because of its dealings with the Atlantic Trailer Corporation the sum of $2,364.21. I further ordered that the interest on this amount was to run from December 2, 1963, that being the date that the suit was docketed in Worcester County. The remaining amount of $1,-930.21 is the amount due and owing the law firm of Webb & Burnett by the Calvin B. Taylor Banking Company for their representation of the Bank in various laws suits that were filed against the Bank as a result of the various escrow transactions and in dealing with the trustee in bankruptcy for the Atlantic Trailer Corporation in claims of the trustee against the Bank by reason of its dealings with the various escrow transactions of Atlantic Trailer Corporation over a period of about two years.

"It is obvious this expense was incurred by the Bank because of its various dealings with the Atlantic Trailer Corporation and the Bank believed it necessary to have counsel during all the proceedings to adequately protect their claim. The fees and expenses were not paid at the time of the hearing of this case therefore I or-

dered the interest in the last named amount to run from the date of the hearing, namely May 23, 1968."

Jones and Gowl contend (1) the agreement was one of indemnity and must be complied with in accordance with its terms, (2) improper and wrongful action by the Bank form the basis for its subsequent loss which is insufficient or no consideration for the note and (3) the trial court erroneously allowed counsel fees.

It is the contention of Jones and Gowl that the terms of the indemnity agreement were not clear. We perceive no real argument other than this advanced on their first point. In *Joseph Bros. Co. v. Schonthal Co.*, 99 Md. 382, 58 A. 205 (1904) Chief Judge McSherry said for this Court:

> "If the contract was evidenced only by the written papers referred to, its construction was for the Court. If it was evidenced partly by the written papers and partly by parol, then it was for the jury to determine what the contract actually was." *Id.* at 392.

In this instance, the court was the trier of fact. The contract was evidenced partly by a writing and partly by parol. Therefore, it was for the court to determine what the contract was. Under Maryland Rule 886 a "the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses."

There was from the testimony of Mr. Cropper alone sufficient evidence for the court to make the finding that it did make, namely that the note was to cover any and all losses incurred by the Bank in any of its dealings with Atlantic.

The loss here sustained by the Bank was a direct outgrowth of its dealings with Atlantic under the arrangement made "on Saturday February 18th, 1961", as referred to in the letter from Atlantic to the Bank dated May 17, 1961, and the note was dated the following Monday, February 20, 1961.

The amount claimed here has been adjusted to reflect the net loss by the Bank in its settlement with the trustee in bankruptcy. Accordingly, we see no improper or wrongful action on the part of the Bank. The Bank became, to all intents and purposes,

a fiduciary when it accepted from Atlantic the assignment of accounts receivable and notified creditors of Atlantic of these assignments and that upon receipt of payment of the accounts receivable sums due those creditors would be disbursed.

We also find that there was sufficient consideration for the note. In *McKenzie v. Egge*, 207 Md. 1, 113 A. 2d 95 (1955) Judge (later Chief Judge) Henderson succinctly summed up consideration for the Court when he there said:

> "It is recognized that any benefit moving to the promisor will suffice, if it is not one which the opposite party was already legally bound to render." *Id.* at 8.

In the instant case the Bank was under no obligation to do that which was requested on behalf of Atlantic. Jones and Gowl were officers of Atlantic. The testimony of Mr. Cropper was to the effect that Atlantic was short of operating capital and that the plan proposed was one that would assist Atlantic with its suppliers. Accordingly, there was adequate consideration. See also *Gordon v. State National Bank*, 249 Md. 378, 384, 239 A. 2d 915 (1968), and *Katski v. Boehm*, 249 Md. 568, 578, 241 A. 2d 129 (1968).

Jones and Gowl make an issue of the fact that the note was reduced to judgment some seven months before the settlement between the Bank and the trustee in bankruptcy for Atlantic which gave rise to the ultimate loss. This argument ignores the fact that the trial court opened the judgment for trial on the merits and that this appeal is from that trial. 2 Poe, *Pleading & Practice,* § 401 (Tiffany's Ed., 1925) states:

> "Judgments, as well as mortgages, may be taken as collateral security for an existing indebtedness, or as security for future advances. When entered for either of these purposes an express written agreement should be filed in the case, in order to show the precise character and object of the judgment and prevent subsequent controversy. In case, however, of disagreement between the parties, evidence is receivable to show for what purposes the judgment was confessed;

whether the debt for the securing of which it was entered has been paid in whole or in part; whether the advances have been made, and, if made, whether they have been repaid in whole or in part, and generally all the facts and circumstances attending the transaction. If confessed merely to secure future advances, the party relying upon it, and seeking to enforce it, will be required to show that such advances were in fact made, precisely as in the case of a mortgage executed for a similar purpose."

The contention of Jones and Gowl that the Bank's loss was brought about by its improper and wrongful action is without foundation. The loss came directly from its dealings with Atlantic.

Jones and Gowl contend that the attorney's fee recovered by the Bank is not properly recoverable since it was to defend the Bank from its wrongful act. We do not agree that the attorney's fees were incurred in the defense of a wrongful action on the part of the Bank.

41 Am. Jur. 2d, *Indemnity*, § 36 states:

"As a general rule, and unless the indemnity contract provides otherwise, an indemnitee is entitled to recover, as part of the damages, reasonable attorneys' fees * * *."

citing, among other cases, for authority *C. & O. Canal Company v. County Commissioners of Allegany County*, 57 Md. 201, 40 Am. Rep. 430 (1881). There an individual had brought an action against the County Commissioners to recover damages for injuries sustained by him by reason of the defective condition of a bridge across the canal over which he was riding on horseback. The road was a public county road and was such before the canal was built. The canal company in constructing its canal cut the road and then connected it by the erection of a bridge. The person injured successfully sued the county which then sued the canal company. This Court held the County Commissioners were entitled to recover from the canal com-

pany the amount of the counsel fee incurred by the Commissioners in defending the suit. Our predecessors there said:

> "To be compelled to go to trial either without the assistance of counsel, or to bear the expense of employing one himself, would be a gross hardship upon a defendant who is sued upon a constructive liability, because of the actual default of another for whose benefit the defense is really conducted, and to whom the law declares it is equitable he should have recourse for indemnity." *Id.* at 226.

There is no dispute with reference to the reasonableness of the attorney's fees. They were not involved in defending a suit caused by any wrongful act of the Bank. They were incurred in an attempt to minimize the ultimate liability of Jones and Gowl. Therefore, they inured to the benefit of Jones and Gowl. We see no error.

*Judgment affirmed; costs to be paid by the appellants.*