## HARRY'S THRIFTY TAVERN, INC. *v.* PITARRA

[No. 109, September Term, 1960.]

*Decided January 10, 1961.*

The cause was argued before BRUNE, C. J., and HENDER-
SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Severn E. Lanier* and *Jack H. Williams* for the appellant.

*Howard B. Stocksdale,* with whom was *Alan H. Stocksdale*
on the brief, for the appellee.

HENDERSON, J., delivered the opinion of the Court.

In a controversy over the sale of a tavern business, the
buyer Pitarra sued for the return of his deposit and damages,
and the seller Harry's Thrifty Tavern, Inc., filed a counter-
claim for damages. The trial court, sitting without a jury,
entered judgment for the buyer and dismissed the counter-
claim. The amount of the judgment included these items: de-
posit, $750; fees and expenses for incorporation, $250; trans-
fer of license, $15; loss of income from a vending machine
business (9 weeks at $50 per week), $450; a total of $1,465.
The seller appealed. There was no cross-appeal. The questions
presented are whether the court erred in finding that the seller
breached the agreement of sale and whether the court erred in
making the award of damages.

The agreement of sale was signed by Pitarra and "Max
Caplan, President", on May 26, 1958. It covered "the tavern
business, chattels and all other assets incidental thereto lo-
cated at 2802 Greenmount Avenue," at a price of $7,500 "plus

stock and cost of new liquor license." Paragraph 3 provided: "The merchandise and stock in trade at wholesale cost as of date of settlement shall be added to the purchase price and together with the cost of the license shall be paid in cash on date of settlement." Presumably, the "cost of the license" called for a pro rata reimbursement to the seller of the annual fee which it had paid on May 1. Paragraph 4 provided that "$750 has been paid as a deposit to the Oriole Realty Company, Seller's agent, and the balance shall be paid or secured as follows: $4,250 shall be paid in cash on date of settlement and the Buyer shall execute a mortgage to the Seller for the balance of $2,500 * * *." Paragraph 5 provided: "Buyer shall have transferred to his name the 6 BWL Liquor License for the premises. If not obtained, this proposal shall be null and void and the deposit paid by the Buyer shall be refunded to him immediately." Paragraph 7 provided: "Seller agrees to satisfy all debts and obligations of the business at or before date of settlement and to comply with all requirements of the Bulk Sales Act * * *." Paragraph 8 provided: "Settlement shall take place within ten days after the liquor board has approved the liquor license transfer to Buyer * * *."

Paragraph 11 stated that the "proposal" was subject to certain "terms and conditions". The first, "a", was that the "Buyer shall be able to secure a lease from Minnie Caplan and Max Caplan, her husband, for five years * * *," with a renewal clause. The Caplans were the owners of the premises where the tavern was located, and they apparently intended to reside in the upper part of the building after the bar was moved to the lower floor. Conditions "b" and "c" provided for "Landlord to make exterior repairs" and "Tenant to make interior repairs." Condition "e" provided: "Heat to be furnished and maintained by tenant." Condition "h" was the "Landlords to remove heat pipes and radiators" and condition "i" "Landlords to move and relocate bar and all bar equipment into lower section of building and install all plumbing, at his own costs, risk and expense." Paragraph 12 provided that "Seller shall keep business in operation until date of settlement."

Upon signing the agreement, Pitarra paid the $750 to the broker and caused a corporation, "Bunky's, Inc.", to be formed to operate the business. On June 11, 1958, Pitarra made application to the Board of Liquor License Commissioners for transfer of the license. On June 26, the Board notified the applicant of its approval of the transfer, subject to meeting the requirements of the Health Department, Building Engineer, and Bulk Sales Act and payment of sales tax. The notice stated that unless the license were transferred within ten days, the approval might be withdrawn. A Health Department notice, dated June 23, called for repairs to toilets, additional ventilation, rat proofing, and the installation of two three-compartment sinks at the bar and in the kitchen unit. These requirements were never met.

On July 14, 1958, the Board of License Commissioners notified Pitarra that unless completed within a week the Board "may" withdraw approval. On July 22, 1958, counsel for Pitarra wrote Caplan, stating that the Seller had not moved the heat pipes, relocated the bar, or installed the plumbing. Counsel stated he had prepared a bill of sale and affidavit under the Bulk Sales Act when he received a draft of lease and chattel mortgage from counsel for the Seller on June 27, 1958. He stated he had not received a list of creditors. He called upon Caplan to complete his part of the bargain by July 31, 1958, under threat of suit for refund of the deposit and damages. The Board wrote another letter on August 13 (not in the record), apparently withdrawing its conditional approval of the transfer. Suit was filed on November 3, 1958.

The appellant contends that the agreement of sale was unambiguous, and under its plain terms the Seller, Harry's Thrifty Tavern, Inc., was not obligated to make the alterations mentioned in paragraph 11-i of the agreement, such obligation resting upon the "Landlords", Mr. and Mrs. Caplan individually. Although this is technically correct, the agreement of sale was conditioned upon the obtention of a lease, wherein the Landlords assumed that obligation, and the lease was never executed. The appellant argues that the performance of the obligation was not a condition precedent to the settlement, but it is clear that settlement was contingent upon a

number of actions by the Seller, including the payment or satisfaction of outstanding debts, the furnishing of a list of creditors, the execution of a bill of sale, an inventory of the merchandise and stock in trade at wholesale cost, as well as the procuring of the lease. The Buyer was never placed in a position where he could make settlement.

Even with regard to the removal of the bar, there was testimony from Pitarra and from the witnesses Mann, Abrams, and Griffith, that Caplan said he would "take care of" the removal on many occasions. Mann testified that the removal was to be made before the settlement and that Pitarra could not complete, or even start, the renovation until that was done. Griffith testified to the same effect. Abrams testified Caplan said he was trying to get the work done, but was having difficulty with the plumbing. All this testimony came in without objection and hence may be considered as bearing upon the construction of the agreement, whether the agreement was ambiguous or not. Cf. *Baltimore Luggage Co. v. Ligon, III,* 208 Md. 406, 413.

The appellant further contends that the work necessary to meet the Health Department requirements was the obligation of the Buyer, to be paid for by him as a part of the cost of the license transfer. But settlement was not to take place until after the Board had approved the transfer, and the Board's approval was contingent upon alterations and additions that could not be completed, or even begun, until the bar was moved to the lower floor. Obviously, the bar sink could not be installed until the bar was moved. The Seller at least owed a duty to cooperate in the obtention of the license upon which the sale was contingent. Cf. *Alois v. Waldman,* 219 Md. 369, 375, and cases cited. Upon all of the evidence in the case we think the trial court could properly find that the appellee was at all times ready, willing, and able to consummate the sale and that the fault was that of the Seller.

On the question of damages, the agreement clearly provided for refund of the deposit if the transfer of the license was "not obtained". The appellant does not challenge the award of the $15 paid as a transfer fee. It contends, however, that the

court erred in its awards for loss of income from a vending machine business and for the fees and expense incident to the incorporation of "Bunky's, Inc." The testimony on both points is meager.

Pitarra testified that he was at the time of transfer and had been prior to May, 1958, regularly employed as a chauffeur with the A. S. Abell Co. Prior to May, 1958, he had "a small vending machine business which I use as a supplementary income * * * $50, $55 a week." He admitted that he sold out the business some time before he saw the advertisement of the tavern for sale and before he began negotiations with Caplan. He didn't try to find any other supplementary work between the date he signed the agreement and the time when suit was filed. At the time of trial he was working as a part time bartender in his off hours. Pitarra also testified he paid his attorney $250 "for the services in incorporating * * * [his] corporation and applying for the transfer of license, and attempting to work out the matter." No bill was produced, and there was no other testimony on the point.

We think the appellee failed to show that the loss of income in a business which he sold before he had any idea of entering into an agreement with the Seller in the instant case was the proximate result of the Seller's breach. Even if we assume a causal connection, it would seem that such diminution of income would be too remote or too speculative to form a proper element of damage. Cf. *M & R Contractors & Builders, Inc. v. Michael*, 215 Md. 340, 347. Even after the Seller breached by failing to perform before July 31, 1958, the deadline fixed by the Buyer, there was nothing to prevent the Buyer from seeking part time employment, as he subsequently did. There is no evidence that such employment was not obtainable. Of course, there is no evidence at all as to what profits the Buyer might have made if the Seller had consummated the sale. Such profits would be speculative and uncertain at best. Cf. *Evergreen Amusement Corporation v. Milstead*, 206 Md. 610, 618. Nor did the trial court purport to assess damages upon any theory of a loss of prospective profits from the tavern business.

On the second point, it is the general rule that costs and expense of litigation, other than the usual and ordinary court costs, are not recoverable in an action for damages. 1 Sedgwick, *Damages* §§ 229, 232 (9th ed.). The general rule was recognized in *McGaw v. Acker, Merrall & Condit Co.*, 111 Md. 153, 160, but it was there held that the expense of an attorney's fee was recoverable where the wrongful act of the defendant forced the plaintiff to engage in litigation with others. The exception has been recognized in other cases. See Note, 45 A.L.R. 2d 1183, and McCormick, *Damages*, § 68. But in the absence of special circumstances, attorney's fees are not a proper element of damages in a suit for breach of contract. See *id.* § 61; *Blum v. William Goldman Theatres*, 164 F. 2d 192, 198 (3d Cir.), and 48 Col. L. Rev. 640; Comments, 34 Tul. L. Rev. 146. We find no such special circumstances in the instant case.

The trial court stated in his opinion that "it was testified" that $250 was paid "[f]or the fees and expense connected with the incorporation." This is not wholly correct. Pitarra's testimony, at best, indicated that he paid his attorney one amount for services in procuring the incorporation, applying for the license transfer and "attempting to work out the matter". This might include all services down to, or even subsequent to, the time of trial. There was no allocation of any part of the fee to the incorporation. Moreover, the agreement did not in terms require incorporation, and the statute provides that liquor licenses may not be issued to corporations, as such. Code (1957), Art. 2B, sec. 40. Even if we assume, without deciding, that the cost of incorporation would be a proper element of damage, the proof was insufficient. The trial court disallowed the $30 paid for the charter, and there was no cross-appeal. We think the court erred in making the award of the $250 fee.

> *Judgment reversed and re-entered*
> *for $765, costs to be divided*
> *equally between the parties.*