568 A.2d 35

## ST. LUKE EVANGELICAL LUTHERAN CHURCH, INC.

v.

## Ginny Ann SMITH.

**No. 44, Sept. Term, 1988.**

Court of Appeals of Maryland.

Jan. 16, 1990.

Motion for Reconsideration
Denied Feb. 22, 1990.

H. Patrick Donohue (Armstrong, Donohue & Ceppos, Chartered, both on brief), Rockville, for petitioner and cross-respondent.

Glenn M. Cooper (Mindy G. Farber, Hope B. Eastman, Paley, Rothman, Goldstein, Rosenberg & Cooper, Chartered, all on brief), Bethesda, for respondent and cross-petitioner.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL*, JJ.

BLACKWELL, Judge.

The main issue in this appeal is whether a jury, in calculating an award of punitive damages, was properly instructed to consider attorney's fees incurred by the plaintiff in the underlying cause of action. In this country, the prevailing party in a lawsuit is not ordinarily entitled to recover reasonable attorney's fees as an element of damages. *Alyeska Pipeline Service Co. v. Wilderness Society,*

---

\* Blackwell, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141, 147 (1975); *Empire Realty Co. Inc. v. Fleisher*, 269 Md. 278, 305 A.2d 144 (1973). This "American Rule," however, refers primarily to compensatory damages. *See* Ehrenzweig, *Reimbursement of Counsel Fees and the Great Society*, 54 Calif.L.Rev. 792 (1966); Note, *Theories of Recovering Attorney's Fees: Exceptions to the American Rule*, 47 UMKC L.Rev. 566 (1979). When punitive damages are involved, we are encouraged to fashion a limited exception to the rule. We hold that whenever punitive damages are appropriate, the amount of reasonable attorney's fees incurred in the pending litigation may be considered by the jury.

### I.

Ms. Ginny Ann Smith (Ms. Smith) grew up in a home with strong ties to its neighborhood church, St. Luke Evangelical Lutheran Church, Inc. (St. Luke's). Over the years, Ms. Smith's mother had been both a volunteer and an employee at St. Luke's, and Ms. Smith spent most of her formative years participating in virtually all of the numerous activities St. Luke's offered its youth.

As she became older, Ms. Smith volunteered as an Administrative Assistant for a church youth-group called Crossroads, and later, for a traveling drama-group called Tent Troupe. Both groups were directed by the Associate Pastor of St. Luke's, Pastor David Shaheen (Pastor Shaheen). As a result of her duties, Ms. Smith worked very closely with Pastor Shaheen, including traveling four months a year as a counselor with him and the other members of Tent Troupe.

After graduating from college in 1982, Ms. Smith was hired by the recently promoted Director of Youth Ministry, Pastor David Buchenroth (Pastor Buchenroth), to the salaried-position of Associate Director of Youth Ministry. Because she continued as a volunteer for Crossroads and Tent Troupe, Ms. Smith then worked for both Pastors Shaheen and Buchenroth.

In February 1984, Ms. Smith went on a church-sponsored trip to the Holy Land led by Pastor Shaheen. While she was out of the country, Pastor Buchenroth entered her office to look for a file he needed to tend to some church business.[1] There he discovered a file marked "DRS–GAS." Curious, Pastor Buchenroth opened the file. He found personal letters and notes from Pastor Shaheen to Ms. Smith.

The correspondence apparently confirmed for Pastor Buchenroth his growing suspicions that Pastor Shaheen and Ms. Smith were engaged in a sexual relationship. With the avowed purpose of protecting Pastor Shaheen's wife, Pastor Buchenroth showed the correspondence to Mrs. Shaheen, and offered her specific details of when and where he believed the various rendezvous had occurred. Before he showed it to her, however, he showed it to Ms. Joan Patton, the Staff Assistant to the Senior Pastor of St. Luke's, Raymond Shaheen—who also happened to be Pastor Shaheen's father.

A few days after his encounter with Mrs. Shaheen, he repeated his allegations, but this time to Ms. Smith's mother. He again offered specific details, as well as his opinion that Pastor Shaheen and her daughter might not return from the church excursion.

After viewing the correspondence and talking with her husband, Mrs. Shaheen told Pastor Buchenroth that she did not believe that her husband's relationship with Ms. Smith was sexual in nature. Accepting Mrs. Shaheen's conclusion, Pastor Buchenroth retracted his accusations.

In addition, at one of a number of group counseling sessions initiated by the church (in an effort to encourage "a healing process"), he stated that he no longer believed

---

1. This was at least the second time Pastor Buchenroth entered Ms. Smith's office without her knowledge. Ms. Smith's mother, who shared the office with her daughter at the time, testified that she had discovered Pastor Buchenroth alone in Ms. Smith's locked office on a prior occasion, and that he was unable to state why he was there.

the relationship between Ms. Smith and Pastor Shaheen was sexual in nature. He also promised at that time to keep his earlier suspicions confidential, and apologized to Ms. Smith and Pastor Shaheen for the pain he had caused them. Despite his promise, Pastor Buchenroth again repeated his original allegations, this time to Mr. and Mrs. Rupert, two members of the congregation active in Tent Troupe.

It was not long before the members of Tent Troupe and most of the congregation were made aware of Pastor Buchenroth's allegations. Soon, Ms. Smith began receiving unsettling telephone calls and mail from members of the congregation. Eventually, a Special Committee[2] was formed, and Ms. Smith was dismissed.

Subjected to scorn in her church and neighborhood, and unable to find a job commensurate with her skills, Ms. Smith sued Pastor Buchenroth in the Circuit Court for Montgomery County for defamation of character and invasion of privacy. She joined as a defendant, Pastor Buchenroth's employer, St. Luke's, on the theory that by dismissing her, the church ratified the allegations made by its agent Pastor Buchenroth. After a two week trial, the jury awarded Ms. Smith $228,904.01 in compensatory damages; $2,000 in punitive damages against Pastor Buchenroth; and $105,875.00 in punitive damages against St. Luke's.

Both defendants appealed. The Court of Special Appeals reversed the judgment against St. Luke's, holding that Ms. Smith was erroneously allowed twice the number of peremptory challenges permitted under Maryland Rule 2–512(h). It also held that the jury had sufficient information to conclude that Pastor Buchenroth had acted with malice, and denied his appeal.

Ms. Smith petitions this Court on the peremptory strike issue. St. Luke's also petitions this Court, contending that

---

2. This Special Committee was formed without the knowledge of the chairperson of the Committee on Staff—the committee normally responsible for advising the church governing-body on matters concerning the hiring and dismissing of personnel.

the circuit court's ruling admitting the $68,441.01–amount of Ms. Smith's attorney's fees on the issue of punitive damages was error.[3] We granted both petitions for *certiorari*. *St. Luke Church v. Smith*, 74 Md.App. 353, 537 A.2d 1196 (1988).

## I.

### *Peremptory Strikes*

■ Maryland Rule 2–512(h) provides:

Each party is permitted four peremptory challenges plus one peremptory challenge for each group of three or less alternate jurors to be impanelled. For purposes of this section, several plaintiffs or several defendants shall be considered as a single party unless the court determines that adverse or hostile interests between plaintiffs or between defendants justify allowing to each of them separate peremptory challenges not exceeding the number available to a single party. The parties shall simultaneously exercise their peremptory challenges by striking from the list.

In other words, coplaintiffs and codefendants are allowed four peremptory strikes, regardless of the number of coparties. When there is a single party on one side and multiple parties on the other, the single party will be entitled to four peremptory challenges while the coparties will ordinarily share four strikes. A single party, then, will have twice as many strikes as each opposing coparty. If, however, the court rules that the coparties have adverse or hostile inter-

---

3. Defendant Buchenroth did not petition this Court from the adverse decision of the Court of Special Appeals. Consequently, judgment was entered in the Circuit Court for Montgomery County against his surety under a supersedeas bond. Ms. Smith filed an order in the circuit court reflecting that the judgments against Pastor Buchenroth and the surety were "paid and satisfied." Therefore, the compensatory damage award, and the punitive damages awarded against Pastor Buchenroth are uncontested. This leaves as the only damage issue whether Ms. Smith's attorney's fees were properly considered by the jury as relating to the punitive damages awarded against St. Luke's.

ests, those parties may be allowed up to four peremptory strikes each. *Id.*

In this case, the trial judge stated that he saw a "potential" for conflict between the two codefendants, St. Luke's Church and Pastor Buchenroth. Not wanting to "impose" on them "having to agree with" only four challenges between them, he gave them four strikes each. He then felt "the only fair thing to do" was to give Ms. Smith another four as well.

Instead of changing the proportions, and giving four peremptory challenges to each of the three parties for a total of twelve strikes—an allowable remedy when adverse or hostile interests are found—the judge merely doubled the number on each side. This gave eight strikes to the plaintiff and eight to the codefendants, totalling sixteen peremptory strikes. It also had the effect of keeping the allotment of strikes in the same proportion they would have been in had the court declined to act in the first place.

In *King v. State Roads Comm'n*, 284 Md. 368, 396 A.2d 267 (1979), both the plaintiff and defendant exercised each of their four peremptory challenges, yet 17 veniremen remained. To obtain a panel of 12, the trial judge struck five additional jurors. We said that this gave the trial judge, with five strikes, "more to say about who would not sit on the panel than either of the parties." *Id.* at 372, 396 A.2d at 270. In holding that this constituted error, we stated that, "a *significant deviation* from the prescribed procedure that impairs or denies" the full peremptory challenge privilege would ordinarily require "reversal without the necessity of showing prejudice." *Id.* at 371, 396 A.2d at 269. [Emphasis added.]

Here, the trial judge, acting on what he deemed to be a "potential" for conflict, implicitly found that the codefendants had hostile interests. The court's response, however, left the parties in virtually the same position they would have been in had no such finding been made. Nevertheless, the court's actions did not influence the selection of jurors

as did the court in *King,* and therefore presented no significant deviation from prescribed procedure. Thus, a showing of prejudice was necessary.

In civil cases, "this Court will not reverse for an error below unless the error 'was both manifestly wrong and substantially injurious,' " and has had a prejudicial effect on the outcome of the case. *Beahm v. Shortall,* 279 Md. 321, 331, 368 A.2d 1005, 1011 (1977). Because the jury strike list was not submitted, the trial record affords no evidence of the number of strikes Ms. Smith actually used. Thus, no prejudice can be demonstrated. We therefore hold the error, if any, was harmless, and reverse the holding of the Court of Special Appeals.

## II.

### *Attorney's Fees as an Element of Punitive Damages*

■ Any consideration of a common-law standard for awarding attorney's fees must begin with the prevailing rule in this country. Known as the American Rule, it prohibits the prevailing party in a lawsuit from recovering his attorney's fees as an element of damages. *Alyeska,* 421 U.S. at 247, 95 S.Ct. at 1616, 44 L.Ed.2d at 147; *Empire,* 269 Md. at 285, 305 A.2d at 148. A brief history of the American Rule reveals that it evolved from the English Rule, which originated some time before the reign of Edward I. At that time, a successful plaintiff could obtain the costs of litigation as an element of damages. *See* C. McCormick, *Handbook on the Law of Damages* 234, 235 (1935), relying on 2 F. Pollock & F. Maitland, *The History of English Law* 597 (2d ed. 1911).

Beginning with the reign of Henry VIII, this benefit was also extended to successful defendants. McCormick at 235. Consequently, the English Rule—which allows the successful party in a lawsuit to recover from the losing party the costs of litigation, including attorney's fees—became firmly established in the English common-law courts. *Id.* The

rule continues in England today.[4] *Alyeska,* 421 U.S. at 245, 95 S.Ct. at 1616, 44 L.Ed.2d at 147–48 (1975); Goodhart, *Costs,* 38 Yale L.J. 849, 849 (1929).

The English Rule was popular in America before the Revolution. McCormick at 235. Originally, the pre-colonial statutes which fixed the scale of recoverable court costs satisfied a substantial portion of the attorney's fees incurred by a successful litigant. *Id.; Restatement (Second) of Torts* § 914, comment a at 492 (1979). This was so even though local statutes rigidly limited the amount recoverable as attorney's fees.[5] McCormick at 235.

Of course, nowhere in this country have statutorily-fixed attorney's fees been revised to keep pace with the fall in the value of money. *Id.* at 236. Such legislative reluctance to keep pace suggests that the principle of full compensation for litigation expenses never firmly took hold in this country. *Id.* at 235–36. This may best be explained by a historic distrust of lawyers prevalent throughout the colonial era, and a then growing preference of the organized bar for fee schedules set by a free market and not hostile legislatures. Leubsdorf, *Toward a History of the American Rule on Attorney Fee Recovery,* 47 Law & Contemp. Probs. 9, 11, 19 (1984).

Nevertheless, there are exceptions to the American Rule. For example, in Maryland, attorney's fees may be awarded when (1) parties to a contract have an agreement to that effect, *Empire,* 269 Md. at 286, 305 A.2d at 148, citing *Webster v. People's Loan, Savings & Deposit Bank,* 160

---

**4.** Interestingly, the same is true in Alaska, where the prevailing party is allowed attorney's fees in most civil cases at the discretion of the court. Alaska Stat. § 9.60.010 (1986). In Nevada, the court may award fees in actions involving $10,000 or less. Nev.Rev.Stat. § 18.010 (1967).

**5.** McCormick offers a glimpse of a pre-colonial Virginia statute which typified the local statutes of the time, in which "it was enacted that in county court actions there should be taxed as costs an attorney's fee of 'fifteen shillings or one hundred and fifty pounds of tobacco.'" McCormick at 235.

Md. 57, 152 A. 815 (1931); (2) there is a statute which allows the imposition of such fees, *Freedman v. Seidler,* 233 Md. 39, 47, 194 A.2d 778, 783 (1963); or (3) the wrongful conduct of a defendant forces a plaintiff into litigation with a third party, *McGaw v. Acker, Merrall & C. Co.,* 111 Md. 153, 160, 73 A. 731, 734 (1909). *See also, Empire,* 269 Md. at 286, 305 A.2d at 148; *Fowler v. Benton,* 245 Md. 540, 550, 226 A.2d 556, 563 (1967). Counsel fees may also be awarded when a plaintiff is forced to defend against a malicious prosecution. *Tully v. Dasher,* 250 Md. 424, 442, 244 A.2d 207, 217 (1968).

Movement away from a strict application of the American Rule began in this country as early as the 19th century, when legislatures launched attacks against it. Leubsdorf at 25. "Three federal statutes, the voting rights legislation of 1870, the Interstate Commerce Act of 1887, and the Sherman Act of 1890, allowed successful plaintiffs to recover their legal expenses in addition to liquidated damages, ordinary damages, or a treble damage award." *Id.,* citing Act of May 31, 1870, 16 Stat. 140, §§ 2, 3, *repealed by* Act of February 8, 1894, 28 Stat. 36; Act of February 4, 1887, 24 Stat. 379, § 8; Sherman Antitrust Act § 7, 26 Stat. 210 (1890).

In Maryland, various statutes permit recovery of attorney's fees. Attorney-fee recovery provisions are contained in either the penalty or liability sections of most of these statutes.[6] One statute authorizes attorney's fees in con-

---

6. Maryland Code (1957, 1987 Repl.Vol.), Article 2B, § 203G; Md.Code (1957, 1986 Repl.Vol.), Art. 48A, §§ 354–0 and 490E; Md.Code (1957, 1988 Repl.Vol.), Art. 56, § 413; Md.Code (1957, 1988 Repl.Vol., 1989 Cum.Supp.), Art. 56 § 637; Md.Code (1957, 1988 Repl.Vol.), Art. 70B, § 19; Md.Code (1957, 1988 Repl.Vol.), Art. 78, § 28A (referred to specifically as penalty); Maryland Code (1975, 1985 Repl.Vol.), Corporations and Associations Article, § 11–703; Md.Code (1974, 1984 Repl. Vol.), Courts & Judicial Proceedings Art., § 10–410; Md.Code (1975, 1983 Repl.Vol.), Commercial Law Art., §§ 11–109, 11–209, 12–911 and 12–1011; Md.Code (1975, 1983 Repl.Vol., 1989 Cum.Supp.), Commercial Law Art., §§ 11–1001 (in which attorney's fees and costs are added to actual and punitive damages), 13–408 (not referred to specifically as penalty) and 19–502; Md.Code (1980, 1986 Repl.Vol.), Finan-

junction with a treble damage award. Maryland Code (1974, 1988 Repl.Vol.), Real Property Article, § 8–203 (attorney's fees awarded along with treble damages). It is reasonable, therefore, to conclude that in this state, an award of attorney's fees serves, in general, as a legislative tool for punishing wrongful conduct.

A punishment rationale is also found in the federal courts. There, the courts "may award counsel fees to a successful party when his opponent has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Hall v. Cole,* 412 U.S. 1, 6, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702, 707 (1973).

The same rule exists in Maryland, where the courts may impose costs and reasonable attorney's fees on either party when a proceeding is brought in bad faith or without substantial justification. Maryland Rule 1–341. "In this class of cases, the underlying rationale of 'fee shifting' is, of course, punitive, and the essential element in triggering the award of fees is therefore the existence of 'bad faith' on the part of the unsuccessful litigant." *Id.; see also Yamaner v. Orkin,* 313 Md. 508, 509, 545 A.2d 1345, 1345 (1988) (in which Judge Rodowsky, speaking for the Court, characterizes the rule as a sanction).

It is this punishment rationale that forms a solid basis for allowing the jury to consider attorney's fees when they are asked to calculate an award of punitive damages. For, like statutorily-imposed attorney fee awards, one of the main goals of punitive damages in Maryland is to punish wrongful conduct. *Wedeman v. City Chevrolet Co.,* 278 Md. 524, 531, 366 A.2d 7, 12 (1976) (action for fraud seeking punitive

---

cial Institutions Art., § 10–120; Md.Code (1982), Health–General Art., §§ 4–301 (referred to specifically as penalty) and 7–1103 (in which attorney's fees are added to punitive damages); Md.Code (1982, 1987 Repl.Vol.), § 19–346; Md.Code (1974, 1988 Repl.Vol.), Real Property Art., §§ 8–203 (attorney's fees awarded in treble damage provision), 8–208 (referred to specifically as penalty), 8A–1001, 8A–1501 and 11–110; Md.Code (1977, 1987 Repl.Vol.), Transportation Art., § 15–213.

damages); *Embrey v. Holly,* 293 Md. 128, 142, 442 A.2d 966, 973 (1982) (punitive damages sought in defamation action). This rationale is consistent with the dictum in *Empire.*

In *Empire,* an action in fraud in which attorney's fees were sought as an element of incidental damages, we held:

The general rule is that, other than the usual and ordinary court costs, the expenses of litigation—including legal fees incurred by the successful party—are not recoverable in an action for damages.

*Id.* at 285, 305 A.2d at 148. *See Freedman,* 233 Md. at 47, 194 A.2d at 783 (1963); *Harry's Thrifty Tavern, Inc. v. Pitarra,* 224 Md. 56, 63, 166 A.2d 908, 912 (1961); *McGaw,* 111 Md. at 160, 73 A. at 734.

While we emphasized the American Rule in *Empire,* we also remarked in dictum that had the case fallen within the framework of punitive damages, the "allowance of legal fees" would have been vastly different. *Empire,* 269 Md. at 288, 305 A.2d at 150. Because equitable relief was sought in *Empire,* and because a court of equity may not award punitive damages, *Prucha v. Weiss,* 233 Md. 479, 483–84, 197 A.2d 253, 255 *cert. denied,* 377 U.S. 992, 84 S.Ct.1916, 12 L.Ed.2d 1045 (1964), we declined to describe exactly what that difference might be. We now take the opportunity to do so.

The American Rule reflects a widespread rejection of both general indemnity for litigants and a "make-whole" rationale as a basis for awarding attorney's fees as an element of compensatory damages. Rowe, *The Legal Theory of Attorney Fee Shifting: A Critical Overview,* 1982 Duke L.J. 651, 660 (1982). Nevertheless,

this leaves open the possibility of grounding some fee shifting on a rationale of punishment for conduct worse than negligence, breach of contract without bad faith, or other bases for compensatory damages. The best example of fee shifting on such a basis is that in many states

legal fees constitute a proper element of punitive damages.

*Id.*

The highest courts of seventeen states have considered whether to permit a jury calculating an award of punitive damages to take into account the amount of reasonable attorney's fees incurred in the pending litigation. Nine states regularly allow jury consideration of attorney's fees on the issue of punitive damages.[7] Two states require evidence sufficient to sustain an award of punitive damages as a threshold condition: once met, attorney's fees may be awarded as an additional compensatory or special damage item.[8] Six states deny jury consideration of reasonable

---

7. *Markey v. Santangelo,* 195 Conn. 76, 485 A.2d 1305 (1985) ("Punitive damages consist of a reasonable expense properly incurred in the litigation."); *Umphrey v. Sprinkel,* 106 Idaho 700, 682 P.2d 1247 (1983) (reasonable attorney's fees proper element of punitive damages); *Newton v. Hornblower,* 224 Kan. 506, 582 P.2d 1136 (1978) ("This court has long recognized that consideration of attorney's fees ... may be taken into consideration in arriving at the amount of punitive damages in an appropriate case."); *Central Bank of Mississippi v. Butler,* 517 So.2d 507 (Miss.1987) ("... attorney's fees may not be awarded unless punitive damages are also proper."); *Senn v. Manchester Bank of St. Louis,* 583 S.W.2d 119 (Mo.1979) (attorney's fees to be awarded in context of punitive damages implied); *Hofer v. Lavender,* 679 S.W.2d 470 (Tex.1984) (exemplary damages are to compensate for inconvenience and attorney's fees); *Debry & Hilton Travel Services, Inc. v. Capitol Intern. Airways, Inc.,* 583 P.2d 1181 (Utah 1978) ("Counsel fees ... can be considered as an element of damages only in those cases in which exemplary damages are or can be awarded."); *Kemp v. Miller,* 166 Va. 661, 186 S.E. 99 (1936) ("The rule in Virginia as to the recovery of counsel fees as damages is well established ... wherein it is held that except where the injury is wanton or malicious and exemplary damages are recoverable, the allowance of fees paid counsel for defending the original proceedings is not proper."); *Olds v. Hosford,* 354 P.2d 947 (Wyo.1960), *reh'g denied,* 359 P.2d 406 (Wyo.1961) (because there was sufficient willful conduct to merit punitive damages, attorneys fees were awarded to prevailing party in replevin action).

8. *Suss v. Schammel,* 375 N.W.2d 252 (Iowa 1985) (where willful and wanton behavior of defendant merits punitive damages, attorney's fees are appropriate); *Villella v. Waikem Motors, Inc.,* 45 Ohio St.3d 36, 543 N.E.2d 464 (1989) ("(i)f punitive damages are proper, the aggrieved party may also recover reasonable attorney's fees").

attorney's fees on the issue of punitive damages,[9] although one of these states denies recovery of punitive damages altogether. Thus, the majority of states to consider the issue, permit the jury to take into account the amount of reasonable attorney's fees incurred in the pending litigation when calculating a punitive damage award.

This is borne out by the Restatement which, while stating the general rule that, "damages in a tort action do not ordinarily include compensation for attorney fees or other expenses of litigation," recognizes the exception that:

> [I]n awarding punitive damages when they are otherwise allowable, the trier of fact may consider the actual or probable expense incurred by the plaintiff in bringing the action.

*Restatement (Second) of Torts,* § 914 and comment a at 492–93 (1979).

A minority of courts [10] decline to allow jury consideration of reasonable attorney's fees on the issue of punitive damages reasoning (1) that such fees are compensatory in nature and therefore not a proper consideration in measuring a punitive damage award; and (2) that the jury ought to have unfettered discretion in deciding the amount of punitive damages. *See e.g., International Electronics Co. v. N.S.T. Metal Prod. Co.,* 370 Pa. 213, 88 A.2d 40, 46 (1952).

It is true that an award of attorney's fees reimburses a plaintiff for his out-of-pocket legal expenses. When viewed solely in this light such fees may seem to be wholly compen-

---

**9.** *Viner v. Untrecht,* 26 Cal.2d 261, 158 P.2d 3 (1945) (punitive damages purely punitive measure and should rest solely in the discretion of the jury); *Winkler v. Roeder,* 23 Neb. 706, 37 N.W. 607 (1888); *Kinane v. Fay,* 111 N.J.L. 553, 168 A. 724 (1933); *International Electronics Co. v. N.S.T. Metal Products Co.,* 370 Pa. 213, 88 A.2d 40 (1952); *Earl v. Tupper,* 45 Vt. 275 (1873) (taxable costs provided by legislature enough to recompense this expense); *Fairbanks v. Witter,* 18 Wis. 287 (1864); although the point seems rather moot in Nebraska, for as a rule, punitive damages are never permitted in that state. *Miller v. Kingsley,* 194 Neb. 123, 230 N.W.2d 472, 474 (1975).

**10.** See n. 9, *supra.*

satory in function. Yet, when viewed in the context of the long-standing prohibition against awarding attorney's fees, and the fact that when they are awarded, they most often serve as a statutorily-imposed punitive measure, the need to include them in compensatory damages diminishes. Under this view, attorney's fees would seem to be an appropriate consideration in measuring an award of punitive damages.

The other point advanced by the minority states, which supports the traditional view that the amount of attorney's fees rests solely within the discretion of the jury, has been the subject of substantial attack. *Restatement (Second) Torts*, § 908, comment f at 464 (1979). Indeed, a look at the various states reveals that Connecticut, Georgia, and Michigan,[11] limit punitive damages by treating them as a form of compensation fixed in proportion to the level of aggravation sustained in an injury; five states [12] either totally or partially prohibit punitive damages. *See* 1 J. Ghiardi & J. Kircher, *Punitive Damages L. & Prac.* §§ 4.02–.12 (Callaghan 1985, 1989 Cum.Supp.). In still other states, the appellate courts exert control over the discretion of the trier of fact, reviewing the amount of a jury's punitive award. *See e.g., Jones v. Fisher,* 42 Wis.2d 209, 166 N.W.2d 175, 181 (1969).

In *Browning–Ferris Industries of Vermont, Inc., v. Kelco Disposal, Inc.,* 492 U.S. ——, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989), the United States Supreme Court held that the

---

**11.** *Waterbury Petroleum Products, Inc. v. Canaan Oil & Fuel Co., Inc.,* 193 Conn. 208, 477 A.2d 988 (1984); *Westview Cemetery, Inc. v. Blanchard,* 234 Ga. 540, 216 S.E.2d 776 (1975); *McFadden v. Tate,* 350 Mich. 84, 85 N.W.2d 181 (1957).

**12.** *Killebrew v. Abbott Laboratories,* 359 So.2d 1275, 1278 (La.1978); *Ashland Oil, Inc. v. Miller Oil Purchasing Co.,* 678 F.2d 1293, 1318 (CA 5, 1982); *Pine v. Rust,* 404 Mass. 411, 535 N.E.2d 1247, 1249 (1989); *Miller v. Kingsley,* 194 Neb. 123, 230 N.W.2d 472, 474 (1975); N.H.Rev. Stat.Ann. § 507:16, as added by Laws 1986, ch. 227:3, effective July 1, 1986; *Stanard v. Bolin,* 88 Wash.2d 614, 565 P.2d 94, 98 (1977). New Hampshire takes a very dim view of punitive damages:

The idea is wrong. It is monstrous heresy. It is an unsightly and unhealthy excrescence, deforming the symmetry of the body of the law.

*Fay v. Parker,* 53 N.H. 342, 382 (1872).

"Excessive Fines Clause" of the Eighth Amendment does not apply to punitive damage awards in cases between private parties. Justice Brennan, in a concurring opinion, offered cogent lament over the vague punitive damage instructions currently given to juries faced with the responsibility of calculating the amount of a punitive award. He stated that:

Without statutory (or at least common-law) standards for the determination of how large an award of punitive damages is appropriate in a given case, juries are left largely to themselves in making this important, and potentially devastating, decision. Indeed, the jury [in *Browning–Ferris*] was sent to the jury room with nothing more than the following terse instruction: 'In determining the amount of punitive damages, you may take account of the character of the defendants, their financial standing, and the nature of their acts.' [Cit. omitted.] Guidance like this is scarcely better than no guidance at all.

*Browning–Ferris* at ——, 109 S.Ct. at 2923, 106 L.Ed.2d at 242. Like the jury in *Browning–Ferris*, juries in Maryland are left largely to themselves in assessing the amount of a punitive damage award, considering predominantly subjective elements such as the character of the defendant, his wealth, and the severity of harm to the plaintiff. *D.C. Transit System v. Brooks*, 264 Md. 578, 589, 287 A.2d 251, 256–57 (1972), citing *Meibus v. Dodge*, 38 Wis. 300 (1875).

The majority in *Browning–Ferris* left the responsibility of developing further guidelines to the states when it held that "the propriety of an award of punitive damages for the conduct in question, and the factors the jury may consider in determining their amount, are questions of state law." *Browning–Ferris* at ——, 109 S.Ct. at 2922, 106 L.Ed.2d at 240.

We think the majority states [13] offer an additional guideline by allowing a jury—faced with determining the appro-

---

**13.** *See* n. 7, *supra.*

priate amount of a punitive damage award—to consider the amount of reasonable attorney's fees incurred in the pending litigation. Those states guide the jury by giving them the "aid of one fairly definite factor which they may take into account in fixing the amount" of punitive damages. McCormick at 297. The Kansas Supreme Court has reached the same conclusion, reasoning that:

> While [punitive damages] imply punishment, and their assessment is largely a matter of discretion with the jury, yet a court is not bound to turn the matter over to them arbitrarily, and without any suggestions as to matters which they ought to consider in their assessment of such damages. *It may and, indeed, ought to call their attention to any matters which will tend to prevent any mere arbitrary and thoughtless award, and to make the assessment fair and reasonable, considering all of the circumstances of the case.... [A]nd [attorney's fees] as influencing the amount of smart-money, are eminently proper.* [Emphasis added.]

*Brewer v. Home–Stake Production Co.,* 200 Kan. 96, 434 P.2d 828, 831, 30 A.L.R.3d 1435, 1440 (1967), quoting *Titus v. Corkins,* 21 Kan. 722 (1879).

Connecticut seems to extend this reasoning even further. McCormick at 297. There, all punitive damage "recovery is limited to an amount which will serve to compensate the plaintiff to the extent of his expenses of litigation less taxable costs." *Triangle Sheet Metal Works, Inc. v. Silver,* 154 Conn. 116, 222 A.2d 220, 225 (1966). Thus, while the jury is allowed to consider reasonable attorney's fees on the issue of punitive damages, attorney's fees also constitute the limit to which an award of punitive damages may be had. *Markey v. Santangelo,* 195 Conn. 76, 485 A.2d 1305, 1308 (1985); McCormick at 297 (stating that, "[m]uch may be said for the practical common sense of this restriction, but, so far as discovered, Connecticut stands alone in this view"). We prefer the reasoning of the Kansas court.

When a jury determines that punitive damages are appropriate and has considered reasonable attorney's fees, two

seemingly disparate goals are satisfied. First, because the jury will be offered objective guidance in calculating the amount of its punitive award, punitive damages will be more accurately measured and the potential for abuse decreased. *Brewer* [434 P.2d] at 831, 30 A.L.R.3d at 1440; McCormick at 297. Second, the plaintiff can be made truly whole in precisely those kinds of cases in which the defendant's wrongful conduct is found to be at its most flagrant, for only in such cases are punitive damages warranted. Rowe, *The Legal Theory of Attorney Fee Shifting: A Critical Overview,* 1982 Duke L.J. 651, 660 (1982). Therefore, to aid the jury in calculating an amount of punitive damages that will deter a party from future wrongful conduct, evidence of reasonable attorney's fees may be considered by the jury whenever punitive damages are appropriate.

Because Pastor Buchenroth retracted his allegations and apologized to many of the principals, including Ms. Smith, the jury could easily have found that the subsequent reiteration of his allegations to the Ruperts was made with knowing falsity or reckless disregard for the truth. The jury had sufficient evidence, if believed, to award punitive damages. As a result, evidence of the amount of Ms. Smith's attorney's fees was admissible.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. THE CASE IS REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY ST. LUKE'S CHURCH.

RODOWSKY, J., dissents in opinion in which MURPHY, C.J., and McAULIFFE, J., concur.

RODOWSKY, Judge, dissenting.

I respectfully dissent because I believe the Court's holding is unsound, both practically and philosophically. As a

practical matter this new rule of "punitive damages" will not control, but will enlarge, punitive damage verdicts. Philosophically the Court's new rule, but for the label attributed to the additional recovery, does not involve punitive damages at all. Rather, it is a judicially adopted rule of fee shifting, contrary to this Court's historic position of viewing fee shifting as the exercise of legislative or rule-making power.

I

The August 1986 Report of the Task Force on Litigation Issues of the American College of Trial Lawyers (ACTL) said with respect to punitive damages, in part:

"The Task Force unanimously agrees that one of the greatest problems with the current tort system is the way in which punitive damages are handled. Awards often bear no relation to deterrence and reflect a jury's dissatisfaction with a defendant and a desire to punish, often without regard to the true harm threatened by a defendant's conduct."

*Id.* at 4. *See also* Jeffries, *A Comment on the Constitutionality of Punitive Damages,* 72 Va.L.Rev. 139 (1986) ("Punitive damages may be inflicted without adequate procedural safeguards, in the absence of meaningful substantive standards, and in virtually unlimited amounts.").

The majority of this Court recognizes the problem. Indeed, one basis on which the majority undertakes to justify its holding is that, "because the jury will be offered objective guidance in calculating the amount of its punitive award, punitive damages will be more accurately measured and the potential for abuse decreased." Opinion at 354. With respect to my colleagues in the majority, this is nothing but an educated guess, unsupported by any empirical data. My educated guess is that the majority's new rule will simply increase punitive damages in both "little" and "big" cases.

In the little case the majority's rule gives the conscientious jury a legitimate basis on which to make the plaintiff "truly whole" by awarding counsel fees. Opinion at 354.[1] Thus, in those cases in which the trial court allows the issue of punitive damages to go to the jury, but in which the jury would not award any conventional punitive damages based solely on the defendant's conduct, the majority's new rule invites the jury to assess at least counsel fees simply for the sake of making the plaintiff "truly whole." In other words, all that the majority has accomplished is to set a floor below which punitive damages will not fall. In Annot., *Attorneys' Fees or Other Expenses of Litigation as Element in Measuring Exemplary or Punitive Damages*, 30 A.L.R.3d 1443 (1970), the editor, J.L. Litwin, suggests the following practice pointer:

> "If the case is a strong one for a punitive award, reference to or proof of the specific expenses may tend to have a limiting effect, holding down the punitive award. On the other hand, if the case is not a particularly strong one on the punitive aspect, and especially if the compensatory damages are more or less minimal, proof of litigation expense may give the jury something concrete on which to hang a substantial punitive award."

*Id.* at 1446.

Nor does it seem realistic to predict for the big case that "punitive damages will be more accurately measured and the potential for abuse decreased." Opinion at 354. That would surely be true had the majority adopted the Connecticut approach under which the amount of "punitive" damages is limited to that which compensates the plaintiff for the expenses of litigation, less taxable costs. *See Triangle Sheet Metal Works, Inc. v. Silver*, 154 Conn. 116, 222 A.2d 220 (1966). But, under the majority's rule, the basic

---

[1]. The second justification by the majority for its new rule is that "the plaintiff can be made truly whole in precisely those kinds of cases in which the defendant's wrongful conduct is found to be at its most flagrant, for only in such cases are punitive damages warranted." Opinion at 354.

standard, such as it is, for punitive damages remains the same, except that the jury will hear a number below which it will be encouraged not to drop. Juries will remain "free to base their decisions on pre-existing biases or redistributional inclinations, subject only to the uncertain constraint of judicial review." Ellis, *Fairness and Efficiency in the Law of Punitive Damages*, 56 So.Cal.L.Rev. 1, 56 (1982) (footnote omitted). It is wishful thinking to suggest that adding counsel fees to punitive damages will overcome the factors identified by Ellis.

Further, the majority's rule seemingly adds more fuel to the fires of litigation in the big case. If there is a good probability that the plaintiff will get to the jury on punitive damages, the majority rule practically assures a recovery above and beyond traditional compensatory damages, simply because the plaintiff has a lawyer. By thus cushioning the downside exposure, the rule discourages settlements and encourages the plaintiff to press on in quest of the bonanza.

## II

The evidence which the jury will hear under the majority's rule, as relevant to the issue of punitive damages, is the amount of, or manner of calculating, a reasonable fee for legal services rendered in representing a prevailing plaintiff in the very case then being tried. Evidence bearing on punitive damages will be the fee actually charged to the plaintiff, subject to a limit of reasonableness. Let us take a hypothetical case. Assume that the owner of a retail store, as the result of a single incident, causes the arrest and prosecution of three suspected shoplifters, A, B and C, under circumstances not sufficient to constitute probable cause. In a malicious prosecution suit by A, B and C a jury, under current Maryland law, could assess punitive damages by inferring malice based upon a lack of probable cause. *See Safeway Stores, Inc. v. Barrack*, 210 Md. 168, 122 A.2d 457 (1956). Assume further that A has agreed to a forty percent contingent fee in the event of trial, and B has

agreed to a thirty-three percent contingent fee, while C has negotiated a twenty-five percent contingent fee. The jury would be instructed, under the majority's rule, to consider different fees in evaluating the punitive damage claims of each plaintiff, even if the conduct of the defendant was identical as to each plaintiff. But the amount which a plaintiff has agreed to pay as counsel fees has no logical relationship to the opprobriousness of the defendant's conduct. The fee agreement between the plaintiff and the plaintiff's attorney has nothing to do with the extent of the malice, if any, with which our hypothetical shopkeeper acted. What was said in *Day v. Woodworth*, 13 How. 363, 371, 14 L.Ed. 181, 185 (1852) is still true today, namely:

"It must be evident, also, that as [the amount of 'smart money'] depends upon the degree of malice, wantonness, oppression, or outrage of the defendant's conduct, the punishment of his delinquency cannot be measured by the expenses of the plaintiff in prosecuting his suit. It is true that damages, assessed by way of example, may thus indirectly compensate the plaintiff for money expended in counsel fees; but the amount of these fees cannot be taken as the measure of punishment or a necessary element in its infliction."

Thus, despite the majority's attempt to label its product as "punitive damages," the additional recovery is compensatory. It makes the plaintiff "truly whole" by shifting to the defendant whose conduct merits punitive damages the obligation to pay the fee agreed to between the plaintiff and the plaintiff's attorney for services in the very action being tried.

Conceptually the question presented here is whether this Court, as a matter of decisional law, should adopt for cases in which punitive damages are awarded an exception to the American rule on counsel fees. For more than 165 years it has been settled in Maryland that fees between attorney and client are not, absent statute, awarded to the prevailing party and are not taxed as costs in the judgment. Nor are counsel fees awarded as damages, absent a contract so

providing, or special circumstances. *See Taylor v. Wahby,*
271 Md. 101, 115–16, 314 A.2d 100, 107–08 (1974); *Empire
Realty Co. v. Fleisher,* 269 Md. 278, 285–86, 305 A.2d 144,
148 (1973); *New Carrollton v. Belsinger Signs, Inc.,* 266
Md. 229, 238, 292 A.2d 648, 652 (1972); *Marney v. Stack,*
261 Md. 78, 81, 273 A.2d 426, 428 (1971); *Freedman v.
Seidler,* 233 Md. 39, 47, 194 A.2d 778, 783 (1963); *Harry's
Thrifty Tavern, Inc. v. Pitarra,* 224 Md. 56, 63, 166 A.2d
908, 912 (1961); *Rice v. Biltmore Apartments Co.,* 141 Md.
507, 516–17, 119 A. 364, 367 (1922); *McGaw v. Acker,
Merrall & Condit Co.,* 111 Md. 153, 160, 73 A. 731, 734
(1909); *Hollander v. Central Metal & Supply Co.,* 109 Md.
131, 154–55, 71 A. 442, 446 (1908); *Hamilton v. Trundle,*
100 Md. 276, 278–79, 59 A. 719, 719–20 (1905); *Singer v.
Fidelity & Deposit Co.,* 96 Md. 221, 224, 54 A. 63 (1903);
*McGraw v. Canton,* 74 Md. 554, 558–59, 22 A. 132 (1891);
*Wood v. State, Use of White,* 66 Md. 61, 69–70, 5 A. 476,
478–79 (1886); *Corner v. Mackintosh,* 48 Md. 374, 390
(1878); *Marshall v. Cooper,* 43 Md. 46, 62 (1875); *Wallis v.
Dilley,* 7 Md. 237, 249 (1854); *Kiersted v. Rogers,* 6 H. & J.
282, 286–87 (1823); *Strike's Case,* 1 Bland 57, 98–99, *aff'd
Strike v. McDonald & Son,* 2 H. & G. 191 (1826).[2]

Indeed, one scholar has generalized that "[a]s far back as
one can trace, courts in this country have allowed winning
litigants to recover their litigation costs from losers only to
the extent prescribed by the legislature." Leubsdorf, *To-
ward a History of the American Rule on Attorney Fee
Recovery,* 47 Law & Contemp. Probs. 9 (1984) (footnote
omitted).

While the American rule was being reaffirmed by this
Court over the decades, the General Assembly from time to

---

**2.** Illustrations of special circumstances are cases where the defen-
dant's wrongful conduct has involved the plaintiff in litigation with
others, see *McGaw v. Acker, Merrall & Condit Co.,* 111 Md. 153, 160, 73
A. 731, 734 (1909), certain implied indemnity actions, see *Jones v.
Calvin B. Taylor Banking Co.,* 253 Md. 430, 253 A.2d 742 (1969), and
actions resulting in declaratory judgments that a liability insurer must
defend the insured in a particular action, see *Bankers & Shippers Ins.
Co. v. Electro Enterprises,* 287 Md. 641, 415 A.2d 278 (1980).

time has made selective exceptions to the general rule. Statutes enacting specific exceptions are listed in the majority opinion at page 346 n. 6. I do not believe those statutes represent "legislative tool[s] for punishing wrongful conduct." Opinion at 347. Many of the statutes cited by the majority are consumer protection statutes where provision has been made for fee shifting in favor of a prevailing plaintiff in order to attempt to equalize the position of the parties. Rowe, *The Legal Theory of Attorney Fee Shifting: A Critical Overview,* 1982 Duke L.J. 651, 663–64 describes the concept:

> "When one side in a particular type of litigation regularly has the advantage of superior resources, holding out the prospect of reimbursement of fees can improve the position and stiffen the resolve of the relatively weaker side. In many types of litigation, of course, no regular imbalance may occur, regardless of the disparities that arise in individual cases. Much general tort and contract litigation probably falls into this category. But when a legislature perceives a regular imbalance, it can seek to match adversaries more evenly by adopting some form of fee shifting to prevent disproportionate advantage in access to and use of the legal process."

(Footnote omitted).[3]

Historically, in Maryland, creation of exceptions to the American rule has been allocated to legislative or rulemak-

---

3. In its note 6, opinion at 346, the majority cites three statutes which are said specifically to refer to counsel fees as a penalty. Md.Code (1974, 1988 Repl.Vol.), § 8–208 of the Real Property Article deals with prohibited provisions in residential leases. Section 8–208(c)(2) provides that, upon a landlord's violation of § 8–208 "the tenant may recover any actual damages incurred as a reason [sic] thereof, including reasonable attorney's fees." The catchline to subsection (c) is *"[p]enalties* for a violation." That catchline was included in the legislative bill. See Ch. 375 of the Acts of 1974. As introduced the bill would have provided for recovery by the tenant of "an amount up to $500" in addition to actual damages and reasonable attorneys' fees. That civil penalty provision was deleted in course of passage. *Id.*

ing action.[4] The majority's prediction of the benefits to be achieved in punitive damage cases by creating an exception to the American rule for those cases is too tenuous a prediction, in my view, to justify departing from the historic pattern. If there is some public support for fee shifting in punitive damage cases, the General Assembly is in a better position than this Court to weigh the probability of the majority's prediction by taking testimony on how the rule has worked in the handful of jurisdictions which have adopted it.

---

Md.Code (1982), § 4–301 of the Health–General Article prohibits, with exceptions, the unauthorized disclosure of specific medical information by a medical care provider. Under subsection (d), "[a] provider of medical care who knowingly violates any provision of this section shall be liable to a plaintiff for any damages recoverable in law or equity, including reasonable attorney's fees." The catchline to subsection (d) is *"[p]enalty,"* a catchline which appeared in the enacting legislative bill, Ch. 21 of the Acts of 1982. By SECTION 4 of that bill it was further enacted that "the Revisor's Notes and catchlines contained in this Act are not law and may not be considered to have been enacted as a part of this Act." 1982 Md. Laws at 1090.

Md.Code (1957, 1988 Repl.Vol.), Art. 78, § 28A is intended to protect underground facilities of public service companies. Subsection (g) imposes a civil penalty of $1,000 for each offense, or ten times the cost of repairing the damage to an underground facility, on a person who excavates without first notifying the appropriate public service company. Actions to recover the civil penalty may be brought either by the public service company owning the damaged facilities or by the Attorney General. The last sentence of subsection (g) (which appears *to be in need of amendment or construction*) literally states: "All penalties recovered from such action, including reasonable attorney's fees, shall be paid into the General Fund of the State Treasury." The majority does not propose that its newly created form of punitive damages be paid into the public treasury.

4. The sanction provided by Maryland Rule 1–341 for maintaining or defending a proceeding in bad faith or without substantial justification is a product of the constitutional rulemaking power of this Court. *While clearly designed to deter the objectionable conduct, it is not* analogous to punitive damages. The remedy under Rule 1–341 is to award to the adverse party reasonable expenses, including reasonable attorneys' fees, incurred by the adverse party in opposing the objectionable proceeding. This standard makes the adverse party whole with respect to the cost of a proceeding which should not have been endured, and is, in that sense, compensatory.

Nor am I persuaded that the prediction of accurate measurement and of decreased abuse in punitive damage cases will be realized because ten jurisdictions now allow counsel fees to be included in an award of punitive damages. *See* opinion at 349 nn.7 and 8.[5] The majority compares that number of states with the number of states which either do not allow punitive damages at all or which have expressly rejected the inclusion of counsel fees as part of punitive damages. I suggest that the proper comparison on the issue here, that of fee shifting, is to jurisdictions which apply the American rule even in cases where punitive damages are awarded. What the majority has done is to compare the jurisdictions which award attorneys' fees within or as punitive damages with those jurisdictions in which there was an unsuccessful attack on the American rule when punitive damages were awarded. I suggest that the absence of a decision on point in a particular jurisdiction means that the American rule is being applied. Classifying fifty common law jurisdictions in the United States (including the District of Columbia and excluding Louisiana) on that basis would produce a substantial majority which do not permit fee shifting in all punitive damages cases as a matter of common law.

Even using the majority's basis of comparison, the count is at least ten to nine. In its note 9 at page 350 the majority lists six states as rejecting its position (California, Nebraska, New Jersey, Pennsylvania, Vermont and Wisconsin). To these must be added Massachusetts and Washington which do not allow any punitive damages at all as a matter of common law, but only by statute. *See* J. Ghiardi & J. Kircher, *Punitive Damages L. & Prac.* (1985, 1989

---

**5.** The majority includes Connecticut in its count of nine states which "regularly allowed jury consideration of attorney's fees on the issue of punitive damages." Essentially Connecticut allows only fee shifting, which it calls punitive damages, but which are not analogous to the unlimited punitive damages, including attorneys' fees, which the majority advocates. Thus I count eight states in the majority's footnote 7 plus two states in the majority's footnote 8, for a total of ten jurisdictions.

Cum.Supp.), § 4.19, at 37–42 Table 4–1, "Summary of States' Positions on Punitive Damages." In addition, by statute in 1986 New Hampshire has abolished all punitive damages except those specifically authorized by statute. *Id.*, § 4.11.5, at 20.

Further, classifying as punitive damages a recovery which is in its nature compensatory will confuse possible legislative attempts to address the problems now prevailing in punitive damage awards. The March 1989 ACTL *Report on Punitive Damages of the Committee on Special Problems in the Administration of Justice* recommended that, "[p]unitive [a]wards [s]hould [n]ot [b]e a [s]urrogate for [c]ompensatory [d]amages." *Id.* at 10. That report gave the following reasons:

"The civil justice system should not recognize punitive awards for the purpose of compensating successful plaintiffs. The common law over time has recognized new rights and measures for compensation and is fully capable of doing so in the future. Economic and noneconomic losses are compensable today, and a clear distinction ought to be maintained between awards of that nature and those which are imposed solely to punish and deter. The maintenance of this distinction is important in administering the rules because there should be differences in the process for obtaining the two types of awards."

*Id.* (footnote omitted). The March 1989 ACTL Report goes on to recommend, *inter alia*, a clear and convincing standard of proof for punitive damages and a flexible cap on punitive damages of "twice the amount of the compensatory award or $250,000, whichever is greater." *Id.* at 15.

The importance of maintaining clear concepts is illustrated by statutes which allow both fee shifting and punitive damages. For example, by Ch. 598 of the Acts of 1989 the General Assembly enacted the Maryland Uniform Trade Secrets Act, Md.Code (1975, 1983 Repl.Vol., 1989 Cum. Supp.), §§ 11–1201 through –1209 of the Commercial Law Article. Section 11–1203(a) provides that "a complainant is entitled to recover damages for misappropriation." Subsec-

tion (b) provides that those damages "may include ... the actual loss caused by misappropriation[.]" Subsection (d) permits the court to award "exemplary damages in an amount not exceeding twice any award made under subsection (a) of" § 11–1203, "[i]f willful and malicious misappropriation exists[.]" Section 11–1204(3) allows the court to award reasonable attorneys' fees to the prevailing party if "[w]illful and malicious misappropriation exists."

These provisions of the Maryland Uniform Trade Secrets Act make complete sense under present law. Counsel fees are not part of traditional actual loss. Counsel fees are not part of exemplary damages. They may be awarded by the court pursuant to the terms of the fee shifting statute. Inasmuch as the majority has today decided that counsel fees are an element of punitive damages, if a statute of this type is enacted or amended in the future, does the plaintiff recover counsel fees twice, once as part of punitive damages and again under the express, fee shifting statute? Do present fee shifting statutes continue to apply if common law punitive damages are also awarded?

By, in effect, enacting a fee shifting statute for punitive damage cases the majority has also confused the functions of court and jury. When the General Assembly responds to a perceived problem by enacting a fee shifting statute, it almost always provides that the reasonable fee allowed is to be set by the court. Providing for fee shifting by allowing that form of recovery within punitive damages permits a jury to consider evidence of a legal fee in any amount unless the trial court can exclude the fee as unreasonable under all interpretations of the evidence. Under the traditional, statutory approach the court pinpoints and awards the precise fee. This is simply another way in which the majority's holding will encourage claims for punitive damages.

I agree that the law of punitive damages is "broke" and needs "fixing." I cannot agree, however, that making attorneys' fees part of punitive damages is the way to fix the break.

Chief Judge MURPHY and Judge McAULIFFE have authorized me to state that they concur in the views expressed in this dissenting opinion.